# United States Court of Appeals
## For the First Circuit

No. 09-1704

UNITED STATES OF AMERICA,

Appellee,

v.

AMIT MATHUR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Boudin, Ripple[*] and Selya, Circuit Judges.

Vivian Shevitz, with whom Jane Simkin Smith was on brief, for appellant.
John A. Capin, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

November 3, 2010

[*]Of the Seventh Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  Defendant-appellant Amit Mathur wants a new trial or, at least, resentencing based on the government's tardy disclosure of Brady material.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  Concluding, as we do, that the district court acted appropriately in addressing the delayed disclosure, we affirm.

## I.  BACKGROUND

We bifurcate our discussion of the background events, first rehearsing the underlying facts and then charting the course of the proceedings below.

### A.  The Scheme.

Refined to its essentials, this case involves a kaleidoscopic stream of misrepresentations and the misappropriation of millions of dollars in client funds.  The best way to capture the essence of what transpired is to follow the trail blazed by the indictment, returned on September 28, 2006, which charged the defendant with eighteen counts of mail fraud and two counts of wire fraud.  See 18 U.S.C. §§ 1341, 1343.

From 1997 until 2005, the defendant ran Entrust Capital Management (Entrust), which he held out as the manager of a hedge fund.  Entrust and the defendant maintained offices in Worcester, Massachusetts, but the defendant's business partner, Rajeev Johar, worked out of a satellite office in Louisiana.

The indictment identified fifteen defrauded clients, five of whom testified at trial. Their testimony confirmed the defendant's successful efforts to inveigle them into investing in the hedge fund. These efforts involved the dissemination of hyperbolic marketing literature, daily e-mails, and in-person presentations, all of which were designed to create a false impression that Entrust managed approximately $105,000,000 in assets for more than 300 investors. These claims were wildly exaggerated, and the defendant's persistent boast that Entrust's hedge fund offered high rewards at low risk was unfounded.

Many potential investors took the bait. To illustrate: The five testifying investors, in the aggregate, entrusted the defendant with roughly $13,500,000 to be invested and managed as part of the hedge fund. One of the five, David Massad, earmarked some additional money — nearly $9,000,000 — for specified stock purchases. The defendant's use of these funds failed to comport either with his own representations or with investors' instructions.

This is how the scheme played out. When the defendant received money earmarked for the hedge fund, he would deposit it into an Entrust account at Commerce Bank — an account over which he had exclusive control. Some money from that account was transferred to a brokerage account at Kimball & Cross Investment Management Corp. (K&C). The defendant retained sole transactional

authority over this account and funneled money from it into the hedge fund. The money left in the Commerce Bank account remained at the defendant's disposal, and he used much of it for personal purposes.

Entrust investors were hoodwinked. They received periodic statements (sometimes monthly, sometimes quarterly) purporting to describe the status of their investments and the hedge fund's performance. The statements reported, without exception, that the clients' money had been invested in the hedge fund and that the investments had appreciated.

The statements, taken in the ensemble, show the magnitude of the fraud. Viewed collectively, they represented that $13,500,000 had been invested in the hedge fund and that the value of the investment had grown to approximately $18,200,000 by the end of 2004. This figure overstated the actual value of the investment by more than $17,000,000; that is, the investment had depreciated by over ninety percent. The discrepancy between Entrust's apocryphal and authentic balance sheets was accounted for by an array of factors: the hedge fund had incurred (and the defendant had hidden) investment losses in excess of $6,000,000; the defendant had invented $4,700,000 in nonexistent appreciation; and

he had diverted more than $5,000,000 in client funds for his own pursuits.[1]

The defendant's dealings with David Massad were more complicated. Beginning in 2000, Massad (the principal owner of Commerce Bank) gave the defendant checks totaling more than $5,000,000 for investment in the hedge fund. In the summer of 2003, he gave the defendant the further sum of $8,787,000 with instructions to purchase 200,000 shares of GMAC preferred stock and 150,000 shares of Ford Motor Credit preferred stock.

The monies that Massad committed to the hedge fund suffered much the same fate as the monies committed by other investors. As to the stock purchases, the defendant assured Massad that he had followed his (Massad's) instructions. In fact, he purchased fewer than half of the specified number of shares and pocketed the difference. For well over a year, he nonetheless sent Massad's accountant regular checks purporting to represent quarterly dividends on the shares that Massad thought he had acquired.[2] Those checks were meant to disguise the defendant's

---

[1] The defendant's handling of the funds of Alok Mathur (his blood relative) furnishes a particularly egregious example of his mendacity. Alok Mathur gave the defendant, for investment, the sum of $530,000. None of this money was ever actually invested. Instead, the defendant spent it on jewelry, automobiles, and recreational gambling.

[2] The defendant makes much of Massad's use of David Mandara, who was his son-in-law as well as his accountant, as an internuncio. He does not indicate what, if anything, was wrong with this arrangement.

failure to purchase the specified number of shares for Massad's account.

From time to time, Massad sought to withdraw sums from his Entrust account.  The defendant obliged.  But in early 2005, Massad asked to withdraw $7,000,000.  The defendant never honored this request.

At about that time, the defendant learned that the Securities and Exchange Commission (SEC) was investigating him.  In response, he contacted his investors and set up a meeting with them.  At this meeting, which was held in April of 2005, the defendant urged the investors to destroy the false statements showing gains in their hedge fund accounts and replace them with statements showing losses.  He explained, falsely, that the proposal was designed to help them avoid tax liability on their gains, which he disingenuously maintained were still increasing. This artifice drew no takers and, therefore, no investors destroyed their original statements in response to it.

In the end, Massad and the other investors sustained substantial losses as a result of the defendant's chicanery.  The SEC's investigation continued, leading to both criminal and civil proceedings against the defendant.

## B.  **The Aftermath**.

This brings us to the defendant's criminal trial, which began on May 5, 2008.  The government introduced evidence

establishing the facts recounted above. In the course of its case in chief, it produced copious evidence corroborating the defendant's role in the fraudulent scheme (including his use of the mails and wire transmissions).

The defendant premised his defense on two lack-of-knowledge theories. First, he argued that he himself was an innocent dupe whose business partner, Johar, had supplied him with misinformation. Second, he argued that he was somehow a pawn in a broad but ill-defined scheme orchestrated by Massad. The evidence at trial belied both theories. It showed, for example, that the defendant received monthly statements from K&C enumerating the funds actually contained in Entrust's brokerage account. Moreover, the defendant had, on occasion, personally directed the avails of specific (profitable) trades both in the hedge fund and in Entrust's account to his personal accounts. There was no probative evidence of any overarching plot masterminded by Massad.

We come now to the denouement. On the seventh day of trial (May 13, 2008), the government rested. Immediately prior to resting, it handed over a previously undisclosed memorandum emanating from the SEC investigation (the SEC Memorandum); this document had not come to the prosecutor's attention until that day. The document contained conclusions drawn from interviews with several of the testifying investors.

With regard to Massad, the SEC Memorandum limned three pieces of information that the defendant characterizes as significant. First, Massad had retained counsel in connection with his financial affairs. Second, Massad had made inconsistent statements concerning the amount of money in his Entrust account. Third, John Sten, an attorney in the law firm of Greenberg Traurig, had represented both Massad and the defendant for some period of time and, during this period, had delivered bogus bank statements to the SEC, ostensibly via a Commerce Bank facsimile machine.

At the end of that day, the defendant moved to dismiss the indictment, arguing that the failure to disclose the SEC Memorandum earlier in the proceedings denied him a fair trial. The government objected and, in an effort to show that the information contained in the SEC Memorandum had previously been turned over, submitted copies of various documents, including SEC interviews of Massad and other investors, that had been given to the defendant's counsel in 2005.

On May 14, the district court offered to halt the trial and give the defendant time to "sort . . . out" the new information, assuring him that he would not be required to proceed until that feat was accomplished. The defendant declined the court's invitation.

On May 15, the court postponed the trial for another day. It renewed its invitation for a continuance and again offered to

allow the defendant to recall any of the government's witnesses for further cross-examination. The defendant refused the offers, and the court then heard arguments on the motion to dismiss.

On the next day the court, ruling ore tenus, denied the motion. It emphasized the defendant's decision neither to recall any witnesses nor to avail himself of a continuance in order to analyze and follow up on the belatedly disclosed information. It observed that the defendant had pointed to nothing in the new material that would have enabled him to impeach any witness, nor had he identified any other aspect of the material that would have been helpful to his case in any meaningful sense. Following the lawyers' summations and the court's charge, the jury found the defendant guilty on all counts.

We fast-forward to April 1, 2009. On that date, the defendant moved for a new trial. See Fed. R. Crim. P. 33. As part of its opposition, the government disclosed additional materials (the Greenberg Traurig Documents) elaborating upon the information contained in the SEC Memorandum. The prosecution represented that it had obtained the Greenberg Traurig Documents from Attorney John Sten after the defendant claimed to have been ignorant of Sten's dual representation of both Massad and himself. The Greenberg Traurig Documents included end-of-year account statements, on Entrust letterheads and bearing Entrust's Louisiana address, which purported to show losses in Massad's investment account for 2002,

2003, and 2004. They also included a facsimile cover sheet purportedly indicating that the documents had been transmitted from a number at Commerce Bank, as well as a transmittal letter from Sten to the SEC.

Four days later, the district court held a non-evidentiary hearing. It denied the defendant's new trial motion, concluding that much of the information contained in the SEC Memorandum, as explicated by the Greenberg Traurig Documents, was either irrelevant or immaterial. Although a small fraction of the information might have been used for impeachment purposes, it was of questionable value and incapable of affecting the outcome of the trial.

The court then turned to sentencing. The defendant did not object to proceeding on that day, nor did he request a continuance. After further arguments and allocution, the court imposed a 120-month incarcerative term on each count of conviction, to run concurrently. This timely appeal followed.

## II. ANALYSIS

The defendant contends that the district court erred both in denying his motion for a new trial and in sentencing him too hastily. These plaints rest on the notion that the government failed to satisfy its Brady obligations and thereby prejudiced the defendant. Given the related nature of these plaints, we address them together.

To gain a new trial based on newly discovered evidence, a defendant normally must pass a four-part test: he must show that (i) the evidence in question was unknown or unavailable to him at the time of trial; (ii) his failure to learn of it did not result from a lack of due diligence on his part; (iii) the evidence is material; and (iv) the evidence, if available upon retrial, would likely bring about an acquittal. United States v. Huddleston, 194 F.3d 214, 218 (1st Cir. 1999); United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980). When, however, a criminal defendant's new trial motion is premised on the belated disclosure of evidence that should have been made available to him in accordance with the imperatives of Brady, a somewhat less formidable standard applies.

To obtain the benefit of this more defendant-friendly paradigm, a defendant must make three showings. "The evidence at issue (whether exculpatory or impeaching) must be favorable to the accused; that evidence must have been either willfully or inadvertently suppressed by the government; and prejudice must have ensued." United States v. Connolly, 504 F.3d 206, 212 (1st Cir. 2007) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). The first two showings are comparable to the first two requirements of the Wright test.

The difference between the two standards lies in the replacement of the last two requirements of the Wright test "with the unitary requirement that the defendant establish 'a reasonable

- 11 -

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 213 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). In this context, the Supreme Court has equated "reasonable probability" with something sufficient to "undermine[] confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419, 434 (1995) (internal quotation omitted).

We have noted two other refinements that distinguish the Brady new trial standard from the ordinary Wright standard. See Connolly, 504 F.3d at 213. First, the probability that a defendant must show does not have to be an "actual probability that the result would have differed"; it may be "a merely theoretical (but still reasonable) probability." Id. (emphasis in original). Second, "undisclosed impeachment evidence, if it suffices to undermine confidence in the outcome of the trial, may carry the day." Id. (citing Bagley, 473 U.S. at 682).

We do not apply these standards directly. In the first instance, that is the responsibility of the trial court. The trial judge, having seen and heard the witnesses at first hand, has a special sense "of the ebb and flow of the recently concluded trial." United States v. Natanel, 938 F.2d 302, 313 (1st Cir. 1991). Thus, his views about the likely impact of newly disclosed evidence deserve considerable deference. Connolly, 504 F.3d at 211; United States v. Maldonado-Rivera, 489 F.3d 60, 65 (1st Cir.

2007).  For those reasons, we review the challenged rulings in this case for abuse of discretion.[3]  See, e.g., Connolly, 504 F.3d at 211; United States v. Alicea, 205 F.3d 480, 486 (1st Cir. 2000).  It is within the confines of this template that we consider whether the late disclosure of either the SEC Memorandum or the Greenberg Traurig Documents warrants relief.

We start with the arguendo assumption that these materials, which comprised part of the parallel SEC investigation, were constructively in the prosecution's possession.  See Strickler, 527 U.S. at 280-81 (extending the disclosure obligation to materials in the possession of government agents).  We also assume, again for argument's sake, that the substance of the materials was not made available to the defendant before trial.  These assumptions permit us to narrow the lens of our inquiry to focus on whether the evidence was favorable to the defendant and, if so, whether its dilatory disclosure prejudiced him.

The defendant asserts that the belatedly disclosed materials would have supported his theory that Massad was not a victim but, rather, was engaged in "funny business of his own."  In his view, the SEC Memorandum shows that Massad retained control of his own finances and told inconsistent stories about his dealings

---

[3]  The government argues that the defendant failed to preserve his claim of error with respect to the Greenberg Traurig Documents and that, therefore, we should review the rejection of that claim only for plain error.  This argument is of dubious force and, in any event, it is unnecessary for us to consider it.

- 13 -

with Entrust.  Moreover, the Greenberg Traurig Documents can be read to indicate that Massad forwarded bogus statements to the SEC (through Sten).  The defendant protests that the timely availability of these materials would have enabled him to impeach Massad.  He further insists that the materials have a potentially exculpatory value because they suggest that (i) Massad was using Sten as part of a plot to manipulate the defendant and to obscure his own malefactions and (ii) Massad and others should be investigated further for potential fraudulent activity.

The defendant's claim that he could have used the belatedly disclosed materials for impeachment purposes is wishful thinking.  The impact of withholding evidence is more severe when it is highly impeaching or when the impeached testimony is essential to the defendant's conviction.  United States v. Avilés-Colón, 536 F.3d 1, 19 (1st Cir. 2008).  Here, however, these conditions do not obtain.  The defendant's attempt to shift the blame to Massad verges on the chimerical.  The impeachment value of the evidence is marginal (necessarily so, given the vagueness of the defendant's allegations), and that value could effectively have been realized by recalling Massad for further cross-examination.

What is more, the modest impeachment potential of this evidence is diminished by the extensive corroboration of Massad's direct testimony.  Like other testifying investors, Massad was able to describe in exquisite detail the losses that he incurred as a

- 14 -

result of the defendant's misrepresentations and misappropriations. To buttress this testimony, the government introduced abundant documentary evidence supporting a conclusion that Massad had been victimized. This evidence included phony statements sent by the defendant purporting to show that Massad's instructions had been followed and that Massad's investments had prospered under the defendant's stewardship. Similarly, the government adduced both documentary and testimonial evidence demonstrating that the defendant had sent Massad ersatz dividends on stock that had never been acquired. The amount of money that Massad ultimately lost in his dealings with the defendant bore grim witness to the veracity of Massad's account. And finally, plenitudinous documentary evidence spoke to the defendant's esurient use of client money for personal expenses and his efforts to hide the truth from his clients.[4] There was a mountain of incriminating evidence against the defendant. Against this backdrop, the marginal impeachment value of the belatedly disclosed materials was manifestly insufficient to place the trial record in "such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at

---

[4] We note in passing that Massad's testimony was not essential to the government's case. The government proved that several other investors were bilked by the defendant in much the same way. This is important because a reviewing court should "evaluate the strength of . . . impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality." Conley v. United States, 415 F.3d 183, 189 (1st Cir. 2005).

435.  Even if Massad was engaged in "funny business of his own" —
a dubious premise on this record — that fact would not weaken the
robust nature of the government's case against the defendant.

The defendant's separate contention that the belatedly
disclosed documents contain exculpatory information is no more
persuasive.  He claims the materials suggest that Massad employed
Sten in furtherance of a contrivance either to manipulate the
defendant or to set him up as a scapegoat.  This claim lacks any
footing in the record.  Furthermore, it is sharply undercut by
Sten's uncontradicted statement to the government that he spoke to
Massad only once — during a three-way telephone conversation in
which the defendant also participated.[5]  Contrary to the
defendant's importunings, neither the SEC Memorandum nor the
Greenberg Traurig Documents, fairly read, support a lack-of-
knowledge defense.  These materials simply do not speak, directly
or indirectly, to the defendant's claim of innocence — and saying
that they do does not make it so.

We need not probe these points more deeply because, in
all events, the defendant has not shown any cognizable prejudice
attributable to the late disclosure.  We explain briefly.

To begin, the defendant has not identified any plausible
strategic option that the delayed disclosure hampered or

---

[5] The defendant could, of course, have recalled Massad to
inquire into this point, or could have called Sten in his own case.
He took no such action.

foreclosed.  See United States v. Misla-Aldarondo, 478 F.3d 52, 63 (1st Cir. 2007); United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990).  He was not prevented from advancing his dual lack-of-knowledge theories at trial, and his counsel argued those theories vigorously.

To cinch matters, the able district court, concerned about whether the late disclosure might inhibit that effort, went to great lengths to ensure that the defendant had a full and fair opportunity to use the new material.  The customary remedy for a Brady violation that surfaces mid-trial is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses.  See, e.g., United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993); United States v. Diaz-Villafane, 874 F.2d 43, 47 (1st Cir. 1989).  The court offered precisely this remediation when the SEC Memorandum came to light, but the defendant repeatedly rejected the proffered anodynes. "Generally, we have viewed the failure to ask for a continuance as an indication that defense counsel was himself satisfied he had sufficient opportunity to use the evidence advantageously." United States v. Osorio, 929 F.2d 753, 758 (1st Cir. 1991) (citing United States v. Ingraldi, 793 F.2d 408, 413 (1st Cir. 1986)).  A fortiori, we can draw a comparable inference from a defendant's outright rejection of a proffered continuance.  Such a decision often will reveal, with conspicuous clarity, defense counsel's

perception that the belatedly disclosed information was not critical to his client's defense. So it is here.

In an effort to blunt the force of this reasoning, the defendant asseverates that the customary remedy was insufficient in the case at hand because the jury already had formed first impressions. Other courts have rejected conclusory arguments along these same lines. See, e.g., United States v. Burke, 571 F.3d 1048, 1055-56 (10th Cir.), cert. denied, 130 S. Ct. 565 (2009); United States v. Davis, 306 F.3d 398, 420-21 (6th Cir. 2002); United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991). So do we: the defendant never explains why, in this case, first impressions should be regarded as decisive. Thus, accepting his argument would create an exception that would swallow in a single gulp the general rule requiring parties to ask for continuances.

In a variation on this theme, the defendant suggests that the late disclosure was prejudicial because, if he had the information before trial, he might have negotiated a favorable plea deal. Because he lacked the wherewithal to cast Massad as the villain of the piece, his thesis runs, the government was more sanguine about both the odds of a conviction and the length of the likely sentence. Consequently, it was less amenable to a plea bargain.

This argument has no traction. The animating principle of Brady is the "avoidance of an unfair trial." Brady, 373 U.S. at

87.  It is, therefore, universally acknowledged that the right memorialized in Brady is a trial right.  See, e.g., United States v. Moussaoui, 591 F.3d 263, 285 (4th Cir. 2010).  Consequently, courts enforce Brady in order "to minimize the chance that an innocent person [will] be found guilty."  Id.  The core question is whether, despite the suppressed evidence, the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Kyles, 514 U.S. at 434.

In urging us to extend Brady's prejudice component to pretrial plea negotiations, the defendant exhorts us to break new ground.  He does not cite a single case standing for this novel approach but, rather, relies on authority extolling the importance of plea negotiations.  See, e.g., Corbitt v. New Jersey, 439 U.S. 212, 222 n.12 (1978).  Although we recognize that plea negotiations are important, that fact provides no support for an unprecedented expansion of Brady.  See United States v. Ruiz, 536 U.S. 622, 632 (2002) (warning that the benefits of plea bargaining would be undermined by an extension of Brady into the pretrial realm).

The Ruiz Court evinced a reluctance to extend a Brady-like right to the realm of pretrial plea negotiations, holding flatly that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."  Id. at 633.  While the Court acknowledged that "the more information the defendant has, the more

aware he is of the likely consequences of a plea," it nonetheless concluded that a prosecutor has no obligation "to share all useful information with the defendant" during pretrial plea negotiations. Id. at 629.

Ruiz teaches that Brady does not protect against the possible prejudice that may ensue from the loss of an opportunity to plea-bargain with complete knowledge of all relevant facts. This makes good sense: when a defendant chooses to admit his guilt, Brady concerns subside. Moussaoui, 591 F.3d at 285; see also Matthew v. Johnson, 201 F.3d 353, 361 (5th Cir. 2000) ("The Brady rule's focus on protecting the integrity of trials suggests that where no trial is to occur, there may be no constitutional violation."). Here, moreover, nothing in the belatedly disclosed documents suggests that they would have significantly strengthened the defendant's hand in plea negotiations even if they had been available to him from the start. Accordingly, we reject this iteration of the defendant's prejudice argument.

The defendant has one more shot in his sling. He posits that the disclosure of the Greenberg Traurig Documents a few days prior to sentencing adversely impacted the length of his sentence and the amount of restitution. He says that, given more time, he could have used the belatedly disclosed material to discount

Massad's losses and, thus, lower both his guideline sentencing range (GSR) and the amount of restitution assessed.[6]

There are several flaws in the fabric of this argument. First, it is underdeveloped; beyond some conclusory rhetoric, the defendant does not explain how the Greenberg Traurig Documents, which contained only information tangentially related to Massad's financial transactions and no information at all related to the amount of Massad's actual losses as an Entrust client, would have helped him to overcome the extensive evidence in the record establishing Massad's losses and the defendant's responsibility for them. It is not our job to put flesh on the bare bones of an underdeveloped argument, United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), and the defendant's plaint could be rejected for that reason alone.

What is more, the claim of sentencing prejudice is undermined by the earlier production of the SEC Memorandum. That report foreshadowed the information contained in the Greenberg Traurig Documents, and the defendant had it in his possession for many months prior to sentencing. He chose neither to follow up on it nor to use it as a means of attacking the loss and restitution calculations. That history impugns his claim that he was unfairly

---

[6] In fraud cases, the amount of loss attributable to conduct related to the crimes of conviction is an important integer in establishing the GSR. See USSG § 2B1.1; see also United States v. Carrasco-De-Jesús, 589 F.3d 22, 24 (1st Cir. 2009).

prejudiced by the later disclosure of the Greenberg Traurig Documents.

If more were needed — and we doubt that it is — actions speak louder than words. When the Greenberg Traurig Documents surfaced, the defendant did not seek a continuance to determine what effect they might have but, rather, allowed the case to proceed to sentencing without objection.

We have held before, and today reaffirm, that a defendant's claim of unfair surprise at sentencing is "severely undermined, if not entirely undone, by his neglect to ask the district court for a continuance to meet the claimed exigency." Diaz-Villafane, 874 F.2d at 47. It is "incumbent upon a party faced with such a situation to ask explicitly that the court grant the time needed to regroup, or waive the point." Id. Thus, the defendant's response to the belated disclosure of the Greenberg Traurig Documents dooms his claim of sentencing prejudice.

We need go no further. The government's casual approach to document production in a criminal case is always a matter of concern. Here, however, the belatedly disclosed documents were small potatoes, unlikely to assist the defendant either in his quest to shift blame to Massad or as a means of shortening his sentence. Any possible utility that the documents might have possessed could have been realized through a continuance, yet defendant eschewed that remedy. The Brady error here, though

regrettable, resulted in no prejudice to the defendant's substantial rights.

## III.   CONCLUSION

For the reasons elucidated above, we conclude, without serious question, that the district court did not abuse its discretion either in rejecting the defendant's <u>Brady</u> claims or in denying his motion for a new trial.


**<u>Affirmed</u>**.