Charles W. NUNLEY, II, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000331–MR.

Supreme Court of Kentucky.

March 21, 2013.

Emily Holt Rhorer, Department of Public Advocacy, Assistant Public Advocate, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Courtney J. Hightower, Jason Bradley Moore, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

The Appellant, Charles W. Nunley, II, was convicted of three counts of sodomy against his step-daughter. On appeal, he claims that he was entitled to a mistrial for an alleged *Brady* violation and that the trial court erred in excusing a juror. Finding no error, this Court affirms his convictions.

## I. Background

The victim in this case, whom this Court will refer to as "Sally,"[1] was born in 1994. Her mother, Sandy Nunley, began seeing the Appellant in 1997, when Sally was three years old. In 2000, Appellant and Sandy married. Sally referred to Appellant as "daddy," and the two were very close.

Near the end of Sally's sixth grade year, Appellant began committing a series of three sexual assaults against Sally.

The first instance occurred on a day when Sally got home from school. She testified that she was on Appellant's bed and her clothes were off from the waist down, though she could not recall how these circumstances came to be. The Appellant put his tongue in Sally's vagina. Afterward, he told her that he knew he was acting weird and that "demons" had made him do it.

---

1. "Sally" is a pseudonym used in lieu of the traditional practice of referring to minor victims of sex crimes by their initials. Both practices are an attempt to protect such victims from embarrassment.

The second instance occurred either over the summer of 2006 or in the fall, shortly after Sally started the seventh grade. This incident also occurred in Appellant's bedroom. Again, he put his tongue in her vagina.

The third incident occurred on November 7, 2006, again in Appellant's bedroom. She recalled wearing pajamas at the time. This time, Appellant kissed her mouth and again put his mouth on and tongue in her vagina. This incident lasted much longer than the other two, and Sally testified that something "triggered" in her body, which "locked up" and began jerking. She stated that nothing like that had ever happened before and she did not know what was going on. Appellant continued despite this reaction.

That day, Sally called a friend and told her what happened. She had told the friend about the previous incidents, but had decided not to tell anyone else because it had not happened in a while. Sally's friend told her that she needed to call her grandmother.

Sally followed this advice and called her grandmother. The grandmother went to the Nunley home and took Sally back to her home. Once there, Sally told her grandmother what had happened. The girl was hysterical at that time. Sally's grandmother called Sally's mother, Sandy. When Sandy arrived at the house, Sally also told her what had happened. Sandy said that they needed to go confront Appellant, which they did. Sally recalled that her mother yelled at Appellant, and that he told her it was not her fault.

Sally did not want to call the police and became extremely upset when her mother suggested they do so. In fact, Sally was so upset that Sandy believed she was on the verge of having a seizure. Sandy told the child that they could hold off on calling the police until she felt she could handle it.

Despite the apparent trauma, Sally did not get counseling for her abuse at that time. However, in the summer of 2006, Sally met her biological father for the first time, and then began spending some time with him. According to Sandy, Sally began seeing a school counselor for the stress of this new relationship.

Upon Sally's revelation to her mother, Appellant moved out of the house. In the weeks following this, he sent two letters to Sandy in which he implicitly admitted to the crimes. Though he did not describe the events, he repeatedly said things like "I can't believe that it all happened," "I don't know what happened, why I did that," and "I never looked at here [sic] like that before, and now I have to live with the fact that not only have I messed her up, and completely blown her trust, but also yours as well." He also said he felt like "an inhuman monster" and had become the "things [he] hate[s]."

In April 2009, Sally began cutting herself. She testified that she did this when she thought about Appellant and that she thought it had been her fault. She testified that it took her mind off her pain. Her cutting eventually came to the attention of a school counselor, who called Sally in to her office. Sally then admitted what had happened with Appellant. At trial, she said that she finally revealed her abuse because she was concerned that Appellant was still around children. Sally was then referred to a social worker, to whom she also revealed what had happened to her. The social worker referred the matter to police, which led to Appellant's prosecution.

Appellant was originally indicted on one count of first-degree sodomy, two counts of second-degree sodomy, and three counts of first-degree sexual abuse. The abuse counts were dismissed and Appellant was

tried only for the three sodomy counts. At trial, he was convicted of all three counts and was sentenced to twenty years in prison.

Appellant now appeals to this Court as a matter of right. Ky. Const. § H0(2)(b).

## II. Analysis

Appellant raises only two issues on appeal: (1) that the trial court should have granted a mistrial when evidence that the child victim was in counseling was first revealed at trial, and (2) that a juror was improperly designated as an alternate and thus relieved from having to decide the case.

### A. The trial court did not err in denying a mistrial.

■ Appellant claims that he was entitled to a mistrial because the Commonwealth failed to disclose before trial what he claims is exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he claims that evidence that Sally was seeing a counselor in 2006 (when she was in the seventh grade), near or at the time of the crimes, was exculpatory, because it would have assisted him in cross-examining her, and that the Commonwealth had a duty to disclose this information before trial.

Appellant first raised the issue of the counseling during cross-examination of Sally. After Sally discussed her 2006 counseling, defense counsel asked at a bench conference whether the prosecutor knew that Sally had been in counseling then. The prosecutor responded that she only knew that Sally had been in counseling after 2009 and did not know if she ever spoke with Sally or her mother about counseling in 2006.

Defense counsel raised the issue again about 30 minutes later, at the close of the Commonwealth's proof. Again, defense counsel asked several questions about whether the prosecutor knew of the 2006 counseling. The prosecutor stated that she did not know "any time periods at all about counseling," and did not know that the counselor had been a school counselor. She also stated that she knew that Sally did not like *a* counselor, as she had testified that day, but did not know the identity of the counselor in question.

Appellant's counsel then moved for a mistrial, claiming that the fact that Sally had been in counseling at or near the time of the crimes was exculpatory material that would have been useful in cross-examining Sally. The trial court denied the motion and found that if there had been any violation, it was not prejudicial to the defense.

On appeal, Appellant raises this same claim. In addition to pointing out that the information would have been useful in cross-examining Sally, he now claims that it could have been crucial to shoring up his defense, which focused on the failure by Sally and her mother to report the crimes or to seek medical or psychological treatment. This, he argues, shows that her allegations were simply not believable. He argues that had he known she was in counseling, which Sally admitted was not undertaken because of the sexual assaults, and Sally had not reported the assaults in that counseling, it would have further proven his defense.

The problem with this claim, however, is that the record does not show that the prosecutor knew or had constructive knowledge that Sally had been in counseling in 2006. When questioned by the defense, the prosecutor stated repeatedly that she did not know that Sally had been in counseling in 2006, and had instead known only generally that Sally was in

counseling, which she assumed meant the counseling began in 2009.

■ There is no question that a defendant's due process rights are violated when a prosecutor, either in good or bad faith, knows of and fails to disclose material evidence to the defense. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). But this rule only applies to "those cases in which the government possesses information that the defense does not." *Bowling v. Commonwealth,* 80 S.W.3d 405, 410 (Ky.2002). While government possession is broadly defined, *see, e.g., Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (reading *Brady* to cover social services records); *Ballard v. Commonwealth,* 743 S.W.2d 21, 22 (Ky.1988) (extending *Brady* to Department for Human Resources records), there is nothing to suggest that the information in question here was ever in the state's possession, and certainly none to suggest that the Commonwealth knew of it or had any control over or access to it.

■ "Moreover, *Brady* only applies to 'the discovery, *after trial,* of information which had been known to the prosecution but unknown to the defense.'" *Bowling,* 80 S.W.3d at 410 (quoting *Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392). Here, the defense not only knew about the proof during trial, it actively cross-examined the witnesses about it. *Brady* does not give a defendant a second chance after trial once he becomes dissatisfied with the outcome if he had a chance at trial to address the evidence complained of.

Perhaps the late discovery of the proof would have entitled Appellant to a short recess or continuance to investigate the things he suggests *might* have been shown by Sally's 2006 counseling, but such a decision would have been within the trial court's sound discretion. But Appellant did not request such a continuance. And the mid-trial discovery of the 2006 counseling certainly did not entitle him to a mistrial, which is available only for a manifest necessity. *E.g., Cardine v. Commonwealth,* 283 S.W.3d 641, 647 (Ky.2009).

**B. The trial court did not err in designating the questionable juror as an alternate and excusing him from deliberating in the case.**

■ Appellant also complains that the trial court erred by designating a juror as an alternate and excusing him from having to deliberate in the case.

Originally, the court seated thirteen jurors so that it could have one alternate. Before opening statements, the bailiff reported that one of the jurors had been having a conversation with a couple of supporters of the Appellant. When asked about it, the juror admitted that he knew the couple but denied knowing whether they had any relationship to any of the parties or victims in the trial. The defense attorney noted that the couple in question were not witnesses.

After the close of proof, the bailiff noted that the same juror had been talking to another person. The bailiff did not overhear anything, but stepped over and asked them to separate, stating that it was improper to talk to the jurors.

At a bench conference, the trial court noted that the person appeared to be sitting with Appellant's supporters and that it was inclined to excuse the juror in question. The defense objected, noting that there was no proof that the juror could not be fair and impartial or that there was any prejudice.

The trial court, noting that it was liberal with jury exclusions, wanted a fair jury, and was uneasy about the juror, decided to

excuse the juror by designating him as an alternate.

Appellant now complains that the juror was removed improperly for cause. He cites RCr 9.36, which states that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." It is unclear that this rule applies to the present situation, since it is part of the rules for selecting a jury.

However, it is also clear that the juror was not properly removed as an "alternate." Criminal Rule 9.32 allows for extra or "alternate" jurors to be selected to hear the proof, as was done in this case, to hedge against the possibility that a juror might become unable to serve. At the end of the case, if more than twelve jurors remain, the excess jurors may be designated as alternates and excused from having to deliberate and decide the case. The "alternate juror" may be designated by agreement of the parties; otherwise, the alternate must be chosen at random. RCr 9.32(1). The juror here was not chosen under either method.

■ The rule, however, recognizes that it sometimes "become[s] necessary to excuse a juror" other than by agreement or random selection. Though the rule is not explicit, this must refer to excusing a juror for cause during trial once it becomes evident that the juror is not qualified to sit. Though this practice is often referred to as designating the juror as the alternate, that is not what it is; otherwise, such a juror could be subject to recall if another member of the jury became unable to sit. *See* RCr 9.32(2). Instead, what technically happens when the juror is disqualified, even in the middle of trial, is that he is struck for cause. This is what the trial judge did in this case.

■ That the judge called what he did "designating the alternate" does not mean he erred in this case. We look instead at the substance of the decision, which was to strike the juror for cause. "A trial court's decision whether to remove a juror from a panel that has already been seated is reviewed for abuse of discretion." *Lester v. Commonwealth*, 132 S.W.3d 857, 863 (Ky. 2004). And we have recently been "emphasizing the importance of excusing doubtful jurors for cause." *Ordway v. Commonwealth*, 391 S.W.3d 762, 781 (Ky. 2013). Indeed, this Court made quite clear in *Ordway* that "[t]he trial court should err on the side of caution by striking the doubtful juror; that is, if a juror falls within a gray area, he should be stricken." *Id.* at 780. As the Court further stated:

> We have attempted to make this fundamental rule clear in a series of cases since *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky.2007). Nevertheless, all too often trial courts, as here, inexplicably put at risk not only the resources of the Court of Justice, but the fundamentally fair trial they are honor-bound to provide, by seating jurors whose ability to try the case fairly and impartially is justifiably doubted. As former trial judges, every member of this Court knows that there is no shortage of citizens in the Commonwealth of Kentucky willing to serve capably and honorably in the most difficult and demanding of trials. What those citizens do not want is to have their time and money spent re-trying a difficult case because, in a prior proceeding, a trial judge was too diffident to excuse jurors who were credibly challenged.

*Id.* (footnote omitted).

In this case, the trial court did the right thing by erring on the side of caution and

excusing the juror. We cannot say that the decision was an abuse of discretion.

### III. Conclusion

For the foregoing reasons, the judgment of the Marion Circuit Court is affirmed.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, SCOTT and VENTERS, JJ., sitting. All concur.