RENDERED: JUNE 20, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0112-MR

JEREMY DANIEL MILLS                        APPELLANT


V.

ON APPEAL FROM ALLEN CIRCUIT COURT
HONORABLE MARK A. THURMOND, JUDGE
NOS. 23-CR-00009 & 23-CR-00122


COMMONWEALTH OF KENTUCKY              APPELLEE


**OPINION OF THE COURT JUSTICE CONLEY**

**<u>REVERSING AND REMANDING</u>**

This case is before the Court as a matter of right from Allen Circuit Court upon the Appellant's, Jeremy Mills, conviction for one count each of Unlawful Transaction with a Minor (Controlled Substances, Victim Under 18); Second-Degree Unlawful Transaction with a Minor (Illegal Sexual Activity); Possession of Matter Portraying Sexual Performance by a Minor; and being a Persistent Felony Offender in the First Degree. Mills was sentenced to twenty years in prison. He argues before this Court three claims of error. First, a failure to grant a directed verdict on all charges based on a mistake of age defense. Second, a failure to dismiss the case when a *Brady v. Maryland*, 373 U.S. 83 (1963), violation occurred during trial. Finally, error in the sentencing phase based on an erroneous instruction misidentifying an amended conviction as a

felony and the Commonwealth's cross-examination of Mills that exceeded the legitimate scope of establishing a previous felony.

We agree a *Brady* violation occurred, and the trial court erred. We do not agree, however, the trial court should have dismissed the case. Because the trial court failed to remedy the tardy mid-trial disclosure of material evidence, reversal is now warranted. We decline to discuss the other alleged errors and remand to the Allen Circuit Court for further proceedings consistent with this opinion.

## I. Facts

Mills met the victim, A.C.,[1] through Facebook in December 2022. A.C. told Mills she was eighteen at the time as she believed Mills could provide her marijuana. The two communicated through Facebook, including Mills sending a picture of his penis and propositioning A.C. for sex in exchange for money. The two agreed to meet.

Mills picked up A.C. in front of her house at approximately 2:00 am on December 16, 2022. Mills told her he was twenty years of age[2] and A.C. told him she was eighteen years of age. When Mills drove her to his house, however, A.C. testified she informed Mills she was in fact thirteen years of age.[3] At the house, Mills and A.C. used methamphetamine and marijuana. Mills performed

---

[1] We use initials to protect the identity of the victim.

[2] Mills was in fact forty-three years old.

[3] There is contrary evidence in the record as to when precisely A.C. informed Mills of her true age. It either occurred when she got in the van or when the two got to Mills' house (if it occurred at all). In either case, both occurred prior to sexual contact.

oral sex upon A.C. at least once, and she performed oral sex upon Mills twice. The two also had vaginal sex. Mills recorded A.C. performing oral sex upon him on his phone, as well as other sexual acts in numerous videos. A.C. testified she did not want to have any kind of intercourse with Mills but could not remember if she told Mills that. She did testify he compelled her to do so.

The next day A.C. was unable to leave and she testified she felt stuck with Mills. She testified Mills had threatened her though she could not recall the specific details; her memory had to be refreshed with the report from the Children's Advocacy Center to even recall a threat had occurred. She testified Mills grabbed her by the throat, choking her, at least once but perhaps a number of times. The two apparently had sex again. Mills then took them both to Kentucky Fried Chicken to eat and visited a friend's house. Mills and the friend departed for a period of time. A.C. eventually told Mills she wanted to go home. After mocking her, he did indeed take her home. A.C. immediately told her family, and she was taken to Vanderbilt University Hospital. Dr. Koscienski, who treated A.C. at the hospital, testified she did not report strangulation, and no petechial bruising was observed. He also testified there was no evidence of trauma to her vaginal or pelvic areas, and that A.C. had in fact reported only consensual sex with her boyfriend.

Detective Jay Costello was the lead investigator. He testified to interviewing Mills, wherein Mills admitted the two were together but denied any intercourse. After showing Mills two messages from Facebook between he and A.C. related to sex, Mills admitted the two had oral sex but nothing else. Mills

3

denied ever knowing A.C. was thirteen years old. During the interview he pointed Det. Costello to A.C.'s photos online which, she conceded at trial, used a filter; the presence of multiple piercings; and multiple tattoos, at least one of which was real, to support his belief she was eighteen years of age. Mills did admit that at one point he thought she was sixteen or seventeen, but dismissed the thought because of her affirmation that she was eighteen.

Mills was indicted for numerous crimes but through the process of trial and negotiation, the only counts remaining for the jury to decide were two counts of first-degree unlawful transaction with a minor; one count of first-degree sodomy; two counts of first-degree rape; two counts of first-degree strangulation; one count of kidnapping; one count of possession of a matter portraying a minor in a sexual performance; and the PFO count.

Mills maintained his defense at trial that he never knew A.C. was underage. A.C. testified to the contrary as well as Edward Troutt, a man who shared a jail cell with Mills for a week. We will further detail Troutt's testimony and his relation to the trial below in our analysis. It suffices for now to say Troutt testified Mills confessed to him he knew A.C. was thirteen prior to the two having sexual relations. Mills sought to undermine this testimony by suggesting Troutt fabricated the confession after reviewing his case file, which Troutt had access to when both lived in the same jail cell.

During jury deliberations, the jury sent a note requesting clarification upon the word "knew" in the jury instructions. The parties agreed to direct the jury to the definition of "knowingly" contained in the instructions. The jury

4

eventually returned a verdict as described above, acquitting Mills on the rape, strangulation, and kidnapping charges.

## II. Standard of Review

The Supreme Court of the United States' ruling in *Brady* did not create a constitutional right to discovery in criminal cases but instead established the minimal disclosure requirements a defendant is entitled to as a matter of Due Process. "There is no question that a defendant's due process rights are violated when a prosecutor, either in good or bad faith, knows of and fails to disclose material evidence to the defense." *Nunley v. Commonwealth*, 393 S.W.3d 9, 13 (Ky. 2013). There is no distinction between exculpatory evidence and impeachment evidence, and the Commonwealth is charged with constructive knowledge of all such evidence even if known only to the police and not the individual prosecutor at trial. *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitely*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J., concurring)). Therefore, a *Brady* violation is established when three elements are met: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

5

"[T]his Court reviews *de novo* whether the conduct of the Commonwealth pertaining to the evidence at issue constitutes a *Brady* violation." *Commonwealth v. Parrish*, 471 S.W.3d 694, 697 (Ky. 2015). Under the third element of "prejudice" courts have also used the term "materiality." *Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002). Whether evidence is material is also a legal conclusion reviewed *de novo. Rosencrantz v. Lafler*, 568 F.3d 577, 587 (6th Cir. 2009). "[A] showing of materiality does not require demonstration by a preponderance [of the evidence] that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.]" *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Nor does our review include a sufficiency of the evidence test but for the undisclosed evidence. *Id.* at 434. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Importantly, the harmless error test is inapplicable to *Brady* violations of the sort alleged here. *Id.* at 435.[4]

Finally, we note that this Court has never definitively confined its understanding of *Brady* violations to only that evidence which is discovered

---

[4] At least some federal circuits recognize the harmless error test still applies when the *Brady* violation is predicated upon a prosecutor's knowing use of perjured testimony. *Gilday v. Callahan*, 59 F.3d 257, 267-68 (1st Cir. 1995); *Rosencrantz,* 568 F.3d at 587. As that circumstance is not present here, we only note the issue in passing.

post-trial. In *Parrish*, we stated regarding *Brady* evidence that "when such information is disclosed at trial *and the defense actively cross-examines on it*, there is no *Brady* violation." *Parrish*, 471 S.W.3d at 698 (emphasis added). The same occurred in *Nunley*, 393 S.W.3d at 13. Thus, we left open the possibility that tardy disclosures of exculpatory or impeachment evidence mid-trial which leave no reasonable opportunity for the defendant to cross-examine the witness could support a *Brady* violation. To that end, every federal circuit court has held a *Brady* violation can be supported by tardy disclosures of evidence pre-trial or during trial.[5] Although we are not obligated to follow federal circuits as we are the Supreme Court of the United States, we cannot think of any reason not to align ourselves with the universal practice of the federal circuits in this instance.

### III.  Analysis

The specific issue before the Court is whether the video interview of Troutt, which was in the Commonwealth's possession but not disclosed prior to trial, violated *Brady*. The Commonwealth argues this issue is not properly preserved. There is also the question of whether the trial court applied the

---

[5] *United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010) (during trial); *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (pre-trial); *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) (day of trial); *United States v. George*, 95 F.4th 200, 209 (4th Cir. 2024) (during trial); *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985) (during trial); *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986) (during trial); *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (during trial); *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) (during trial); *United States v. Cloud*, 102 F.4th 968, 979 (9th Cir. 2024) (during trial); *United States v. Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012) (during trial); *United States v. Knight*, 867 F.2d 1285, 1289 (11th Cir. 1989) (during trial); *United States v. Borda*, 848 F.3d 1044, 1067 (D.C. Cir. 2017) (pre-trial).

7

appropriate analysis from its perspective mid-trial. Finally, there is the standard *Brady* analysis from an appellate court's perspective. We address each issue in turn.

### A. Preservation

The Commonwealth contends Mills has not properly preserved his argument that *Brady* applies since he only mentioned it briefly in passing and never developed his argument fully; and, additionally, because the specific relief requested to the trial court at the conclusion of his argument was dismissal of the case with prejudice for prosecutorial misconduct. It is true "the appellant has the duty to make timely objections and if he wants to preserve his issues for review by this court the objections must be specific enough to indicate to the trial court and this court what it is he is objecting to." *Bell v. Commonwealth*, 473 S.W.2d 820, 821 (Ky. 1971). This requirement is not a formalistic anachronism. Objections that are specific as to the alleged problem and requesting a specific remedy are necessary "in fairness to the party offering the evidence and to give the trial court the opportunity to remedy any errors in the proceedings." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688 (Ky. 2009). Preservation is necessary but it is not a high bar. "[T]he litigant need only object or otherwise bring the issue to the trial court's attention." *Miller v. Commonwealth*, 391 S.W.3d 801, 807 (Ky. 2013). He must request specific relief, and we have found where the trial court only implicitly denies that relief, there is preservation. *Id.*

Upon review of the record, we find this issue properly preserved. When the Commonwealth informed the trial court of the interview and its failure to disclose, Judge Thurmond was justly frustrated and laconically declared, "That is a problem." He then looked to defense counsel and asked if this was the first she had heard of it, and if she had any position to take. Defense counsel affirmed she was learning about the video simultaneously with the trial court and said, "Your honor, that may be a *Brady* violation." The trial court replied, "That is a significant issue." After opportunity to watch the video had been given, oral arguments were heard, and Mills' arguments focused on the significance of the video as a source of impeachment to attack Troutt's credibility, which is a prong of *Brady*.

Specifically, Mills' counsel argued there were three "inconsistencies" she would have cross-examined Troutt upon had the video been known. First, that Troutt in the video says Mills told him A.C. informed him she was a "juvenile," as opposed to his trial testimony that Mills said she informed him she was thirteen.[6] Second, that Troutt failed to mention the circumstances of when and where A.C. informed Mills of her true age in the video interview, whereas at trial he testified Mills admitted she told him when she got into his van. Third, Troutt's allegation that Mills admitted to having anal sex with A.C. Mills argued that while legal practitioners are generally aware that sodomy includes both

---

[6] Defense counsel explained to the trial court that "juvenile" is a term that encompasses all minors up to age 17, therefore, it was an inconsistency. Defense counsel also argued "juvenile" is not a normal term for teenagers to refer to themselves as but is more commonly used by lawyers and police officers.

anal and oral sex, the average person colloquially understands sodomy to refer to anal sex. Thus, Mills argued the video in fact supports his contention that Troutt reviewed his case file and fabricated the confession.

Additionally, the trial court specifically asked defense counsel to explain how this interview, had it been available, would have altered her cross examination. This goes directly to *Brady*'s materiality prong. After arguments were heard, the trial court recessed for approximately ninety minutes to consider the issue. When he returned, the trial court declined to dismiss the indictment with prejudice as requested by Mills because he could not find any evidence of bad faith on the part of the Commonwealth. The trial court continued,

> The real question to the court, in the court's mind here, is whether there has been a violation of the rights under *Brady v. Maryland* which has occurred, which so prejudices the rights of the defendant to be able to make his defense that there creates a manifest necessity for a mistrial and perhaps dismissal of the charges.

The trial court answered in the negative. The trial court stated it viewed the test of materiality as being if the video interview been disclosed prior to trial, would it have altered the results of the proceeding. It held the results of the proceeding were unlikely to have been altered had there been disclosure because it believed Troutt was unlikely to change his testimony had he been confronted with his statements made in the video.

Thus, we have all elements necessary for preservation: an objection on a specific issue; with specific argument, so as to make the trial court aware; a

request for relief; and a ruling upon that objection granting or denying said requested relief.

## B. The Proper Test for Trial Courts for Tardy Mid-trial Disclosures

Having demonstrated above the universal rule in the federal circuits that *Brady* does apply to tardy disclosures of evidence pre-trial or mid-trial, we can proceed to announcing the correct test trial courts are to apply when confronted with such an occurrence. The trial court below believed it could not conclude the video was material unless it could find the evidence would have altered the results of the proceedings. The trial court made a finding that Troutt's testimony would not have changed, nor the outcome of the proceeding been altered, had Troutt been confronted with his statements in the video, therefore, the video was not material. This is an incorrect test for trial courts to apply.

As recognized and elucidated upon by the Ninth Circuit, the typical *Brady* test is "retrospective" and focuses on the reasonable probability of a different outcome at trial. *United States v. Cloud*, 102 F.4th 968, 979 (9th Cir. 2024). That test "is a poor fit in cases like this one, where the suppression is discovered during trial and before a 'look back' is possible." *Id.* Because the typical "retrospective definition of materiality is appropriate only in the context of appellate review," trial courts confronted with a tardy pre-trial or mid-trial disclosure of evidence should confine themselves to analyzing "whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses." *Id.* at 979

11

(quoting *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013)). As one federal district court has put it:

> The only question before (and even during) trial is whether the evidence at issue may be "favorable to the accused"; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming [or on-going] trial.

*United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005). This test is not a high bar or heavy burden; it is satisfied "if there is indication that it may play [an] 'important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'"

*Id.* at 15 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).

> Factors to aid this determination have also been identified.
>
> [T]he materiality inquiry should evaluate the relative value of the withheld evidence "on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point." We also suggested that the materiality analysis could consider whether, had the evidence been timely disclosed, it might have altered the prosecution or defense strategy.

*Cloud,* 102 F.4th at 980 (quoting *United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020)) (internal citations omitted). The trial court's instincts were correct when it asked defense counsel to explain how her cross examination of Troutt would have differed. But the trial court's ultimate resolution was not that it did not believe defense counsel's cross examination would have changed, but that Troutt's testimony would not have changed. This is pure speculation and is an inappropriate test for materiality from the trial court's perspective.

12

Moreover, because the evidence below would have been used for impeachment purposes to attack Troutt's credibility, that his testimony might have changed is only one facet of a credibility analysis. As long recognized by every court, "the primary purpose" of in-person testimony is so that a witness must "stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Campbell v. Commonwealth*, 671 S.W.3d 153, 158 (Ky. 2023) (quoting *Mattox v. United States*, 156 U.S. 237, 242–43 (1895)). It is not merely the words a witness says that determines his credibility, but his demeanor and his body language.[7] How Troutt would have reacted non-verbally in cross-examination if confronted with his statements in the video is also entirely speculative and cannot provide a firm foundation to judge materiality.

Finally, "[t]he customary remedy for a *Brady* violation that surfaces mid-trial is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses." *United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010); *cf. Cloud*, 102 F.4th at 981 (holding no abuse of discretion when district court excluded witness and sanctioned attorneys for *Brady* violation). Here the video was only ten minutes long and the trial court

---

[7] Indeed, it is well-accepted that "[b]ody language is the single most important credibility factor. Communication research has demonstrated time and time again that when a speaker's body language conflicts with his or her words, the observer will always believe the body language." Noelle Nelson, *Enhancing Credibility Through Body Language*, Prac. Law., July 1994, at 73, 74.

did briefly postpone bringing in the jury to allow Mills and his lawyer to review the video, evaluate how to proceed, and make arguments before the court. When the Commonwealth suggested playing the video at trial, the trial court correctly noted that Mills' argument was the prejudice to his ability to fully attack Troutt's credibility on cross-examination; merely playing the video would not be a remedy and would likely have inured to the Commonwealth's benefit.

When the Commonwealth suggested recalling Troutt, however, the trial court demurred. Troutt was incarcerated in Tennessee at the time and the trial court apparently went through some difficulties (which it noted was really the responsibility of the Commonwealth) to get Troutt to trial. The Commonwealth does not point us in its briefing to what exactly these difficulties were, and the trial court did not elucidate upon them during the hearing. We may safely assume it involved some kind of negotiation with the custodial authorities in Tennessee to arrange transportation. We have, however, rejected similar arguments in the Confrontation Clause analysis where the Commonwealth sought to justify remote testimony by citing the cost, $10,000 to $15,000, to transport the witnesses. *Faughn v. Commonwealth*, 694 S.W.3d 339, 347 (Ky. 2024). We held, "a savings of ten to fifteen-thousand dollars cannot outweigh a defendant's constitutional rights." *Id.* There is no citation to the record of the cost to transport Troutt to Allen County for trial. While the trial court and Commonwealth may have found arranging that transportation difficult, inconvenience "cannot outweigh a defendant's constitutional rights." *Id.*

14

Therefore, the trial court erred by applying the typical retrospective *Brady* test that is only appropriate for appellate courts. By applying such test, the trial court actually engaged in a speculative inquiry that federal circuit and district courts have condemned as inappropriate. The trial court should only have made a legal conclusion as to whether the video evidence was exculpatory to Mills or impeaching of a witness based on the factors identified above. If so, then it should have recalled Troutt so the video could have been played and cross-examination conducted. If that necessitated a continuance of trial, then so be it.

### C. Appellate Review under *Brady* of the Video Evidence

Though the trial court erred in the test it applied, that does not demand reversal if only because the proper test has never been explicitly endorsed by this Court until now. This Court is still in a position to apply the traditional *Brady* analysis appropriate for appellate review. The three elements are favorability, suppression, and prejudice/materiality. *Strickler*, 527 U.S. at 281-82. That the video was suppressed by the Commonwealth is not in doubt. "There is no question that a defendant's due process rights are violated when a prosecutor, either in good or bad faith, knows of and fails to disclose material evidence to the defense." *Nunley*, 393 S.W.3d at 13. The Commonwealth possessed the video via the police, and the Commonwealth Attorney is charged with constructive knowledge of evidence in the state's possession. *Id.*; *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in

15

the case, including the police."). The failure to disclose results in suppression under *Brady*.

As to the first prong, we conclude the video is favorable as impeachment evidence. Impeachment evidence is that which has "the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *Leka*, 257 F.3d at 98 (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)). Mills maintained his defense at trial that he never knew A.C. was underage. A.C. testified to the contrary as well as Troutt. Troutt testified Mills confessed to him that he knew A.C. was thirteen years old, they had sex, he gave her methamphetamine, and that she performed oral sex on him. Mills sought to attack Troutt's credibility by insinuating Troutt had access to Mills' case file which was kept in the cell they shared. To summarize, Mills sought to show Troutt fabricated his confession by reviewing Mills' case file to learn the charges against him, and then approached investigators with a concocted confession based on what Troutt had seen in the file.[8]

There was, however, no direct evidence this occurred. Mills could only suggest it and Troutt obviously denied it. The video interview, however, shows Troutt informing investigators that Mills confessed to him that he had anal sex with A.C. There was never an accusation that anal sex had occurred from A.C. either before or during trial; there was no medical evidence of such; and the

---

[8] There is evidence in the record to suggest Troutt acted with ulterior motives. Although he testified he had not received any promises from the Commonwealth in exchange for his testimony, he admitted he initially asked for shock probation. He also conceded that he reported Mills for bullying which got the latter transferred to a different jail. Thus, it is clear Mills and Troutt were not friendly.

sodomy charges against Mills were related to the allegation of oral sex with A.C. The video interview therefore can plausibly be understood as supporting Mills' argument that Troutt read through his case file, saw the charges against him, and fabricated the confession based on that information. *See Bundy*, 968 F.3d at 1033 (holding "[w]hether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here.").

Mills' argument that sodomy is colloquially understood as anal sex compared to its legal definition in Kentucky, which is more expansive, is not implausible. Indeed, this Court has recognized "there is likely to be little colloquial distinction in the mind of a lay juror between 'anal rape' and 'sodomy.'" *Behrens v. Commonwealth*, 677 S.W.3d 424, 435 (Ky. 2023). In other words, sodomy and anal sex are practically synonymous in the popular mind. Even our laws reflect this for despite the variety of different definitions of sodomy amongst the states, "[o]ne act that is almost universally prohibited by sodomy statutes is anal intercourse[.]" *In re B.H.,* 138 A.3d 774, 780 (R.I. 2016) (quoting 70C Am. Jur. 2d *Sodomy* § 3 at 644 (2011)). Even our common law did not consider oral sex to be sodomy but confined it to anal sex between men or sex between a man and animal. *Commonwealth v. Wasson,* 842 S.W.2d 487, 491 (Ky. 1992) (quoting *Commonwealth v. Poindexter,* 118 S.W. 943, 944 (1909), *overruled on other grounds by Calloway Cnty. Sheriff's Dep't v. Woodall,* 607 S.W.3d 557 (Ky. 2020).[9] Therefore, we conclude the video is favorable

---

[9] It is worth noting that in the last hundred years even this definition has changed. The average person would not colloquially understand sex with an animal as sodomy but instead would use the term bestiality.

evidence to Mills for impeachment purposes based on his third argument made to the trial court.

Finally, we conclude this evidence is material. We highlight again that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.]" *Kyles*, 514 U.S. at 434. Our review does not take into account the sufficiency of the evidence at trial, nor do we review for harmless error. *Id.* The probability of a different result test under *Brady* focuses on whether "he received a fair trial [with the absence of the evidence], understood as a trial resulting in a verdict worthy of confidence." *Id.* "[T]he probability that a defendant must show does not have to be an '*actual* probability that the result would have differed'; it may be 'a merely theoretical (but still reasonable) probability.'" *Mathur*, 624 F.3d at 504 (quoting *United States v. Connolly*, 504 F.3d 206, 213 (1st Cir. 2007)).

Two factors control our conclusion that without this evidence and the ability to impeach Troutt based upon it Mills did not receive a verdict worthy of confidence. First, the manifest fact that the jury did not believe A.C. in all her testimony. The jury acquitted Mills on all counts of rape, strangulation, and kidnapping. If the jury believed A.C. was a perfectly credible witness, then it would not have done this. Second, the equally manifest fact that the jury was debating the knowledge element of the crimes. We know without doubt the jury requested the trial court give it further clarification on the word "knew" contained in the jury instructions. We will never know exactly the contents of

18

the debate amongst the jury, but it is obvious Mills' knowledge of A.C.'s true age was a topic of discussion to such a degree that the jury desired clarification. From our retrospective vantage point, it is sufficiently clear that Troutt's testimony was crucial to the Commonwealth to corroborate A.C., whose own credibility was called into question. It was, therefore, equally crucial to Mills' defense to undermine Troutt's credibility. A reasonable juror could view the video, listen to the cross-examination, and be persuaded by Mills' argument that it is direct evidence tending to prove that Troutt fabricated Mills' confession. Consequently, reversal of the convictions is the required remedy. *Bowling v. Commonwealth,* 80 S.W.3d 405, 410 (Ky. 2002). Because we reverse Mills' convictions on this basis, we need not address his other claims of error and decline to do so.

### IV.    Conclusion

For the aforementioned reasons, we hold a *Brady* violation occurred which calls into doubt our confidence in the verdict below. The trial court erred by applying the typical *Brady* test that is only appropriate in an appellate court context. Nonetheless, we conclude the trial court erred in its conclusion under that test, as the video interview of Troutt, a crucial corroborating witness for the Commonwealth, was favorable evidence; was suppressed by the Commonwealth; and was material to the case as a reasonable juror could view the video and believe it to be direct evidence supporting Mills' argument regarding Troutt's alleged fabrication of his confession. Accordingly, Mills'

19

convictions are reversed, and we remand to Allen Circuit Court for further proceedings consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General