# United States Court of Appeals
## For the First Circuit

No. 16-2356

UNITED STATES OF AMERICA,

Appellee,

v.

FRANK PEAKE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lipez, Circuit Judges.

David Oscar Markus, with whom Mona E. Markus, A. Margot Moss,
and Markus/Moss PLLC were on brief, for appellant.
Sean Sandoloski, Attorney, Antitrust Division, United States
Department of Justice, with whom Brent Snyder, Acting Assistant
Attorney General, James J. Fredricks and Lisa M. Phelan, Attorneys,
Antitrust Division, were on brief, for appellee.

October 23, 2017

**SELYA**, **Circuit Judge**. Defendant-appellant Frank Peake, smarting under the double sting of his conviction for antitrust conspiracy and this court's affirmance of that conviction, asked the district court to wipe the slate clean and grant him a new trial based on freshly discovered evidence. The district court demurred. Peake appeals. After careful consideration, we affirm the judgment below.

## I.  BACKGROUND

We sketch the facts, mindful that the reader who hungers for more exegetic detail may consult our earlier opinion affirming the underlying conviction and the district court's thoughtful rescript denying the appellant's motion for a new trial. See United States v. Peake (Peake I), 804 F.3d 81 (1st Cir. 2015), cert. denied, 137 S. Ct. 36 (2016); United States v. Peake (Peake II), No. 11-cr-512, 2016 WL 8234673 (D.P.R. Oct. 18, 2016).

The government's case against the appellant had its roots in "one of the largest antitrust conspiracies" in United States history. Peake I, 804 F.3d at 84. Between 2002 and 2008, Sea Star Line (Sea Star) and Horizon Lines (Horizon), both leading freight carriers, agreed to fix rates and surcharges for Puerto Rico-bound cargo in a multi-pronged effort to maintain market share and to squelch competition.[1] See id. at 85. In 2003, the appellant

---

[1] Although not relevant here, a third company, Crowley Lines, was part of the conspiracy.

became Sea Star's chief operating officer and, later, its president. During his tenure, Sea Star reaped over half-a-billion dollars in total revenue. See id. at 99-100.

While the appellant joined the conspiracy in 2005, we fast-forward to November of 2011, at which time, a federal grand jury indicted the appellant on a charge of conspiracy to violate section one of the Sherman Act, which proscribes "agreements in restraint of trade or commerce 'among the several [s]tates.'" Id. at 86 (quoting 15 U.S.C. § 1). During the appellant's nine-day trial in 2013, the government introduced testimony from three cooperating witnesses: Gabriel Serra (a Horizon senior vice president), Greg Glova (a mid-level Horizon executive who reported to Serra), and Peter Baci (a Sea Star executive who reported to the appellant). These three witnesses consistently described the conspiracy's modus operandi and hierarchical structure. Pertinently, Baci and Glova would resolve day-to-day issues relating to pricing and market-share allocation, while the appellant and Serra would settle any lingering disputes. For instance, Serra testified that when Walgreens, a significant importer of consumer goods to Puerto Rico, decided to deal exclusively with Horizon rather than splitting shipping contracts between Horizon and Sea Star, Serra and the appellant agreed that Horizon "would compensate" Sea Star for its lost revenue "by shifting cargo to Sea Star vessels" and paying Sea Star to carry

- 3 -

Horizon cargo.  Id. at 85.  This trio of witnesses also described meetings that the appellant had with Horizon officials regarding the conspiracy, including a 2006 summit meeting in Orlando at which the appellant and Serra resolved price-fixing and market-allocation issues.

The government's case included a trove of incriminating e-mails linking the appellant to the conspiracy.  Among these e-mails was one sent by the appellant to a Horizon executive discussing prices quoted to a customer and expressing the appellant's desire to "avoid a price war."  Id.  In other e-mails, the appellant consulted with Horizon officials before sending proposals to potential customers so that the two companies would maintain balanced market shares.

All in all, an "overwhelming amount" of evidence, including travel and telephone records, corroborated the appellant's leading role in orchestrating the conspiracy.  Id. at 94.  Indeed, the evidence showed that the appellant and Serra had more than 300 conversations, using their personal telephones, between 2003 and 2008.

In addition, Ron Reynolds, a United States Department of Agriculture (USDA) agent, testified about the conspiracy's impact on federal food assistance programs.  Gabriel Lafitte, the purchasing director for nearly 200 Burger King restaurants in

Puerto Rico, testified about the conspiracy's impact on the chain's island-wide costs and prices.

The appellant did not offer any witnesses at trial. Nor did he spend much time attacking the existence of the charged conspiracy. Instead, his counsel argued that the government had failed to prove that the appellant knowingly participated in the conspiracy. In this vein, counsel made much of the fact that William Stallings, a former Sea Star executive cooperating with the government, had recorded conversations with conspiracy participants for two months, but had never recorded any statements by the appellant.

The jury rejected the appellant's defense and found him guilty. The district court sentenced him to sixty months' imprisonment, and we affirmed the conviction and sentence. See id. at 85, 100.

Long after the jury had rendered its verdict, the appellant learned that Stallings (whom neither party had called as a witness) had filed a qui tam action pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, on January 15, 2013. In his complaint, Stallings alleged that Sea Star and Horizon had collogued to defraud the government. Stallings's qui tam action was unsealed and settled approximately thirteen months later.[2] Sea

---

[2] The FCA authorizes private plaintiffs to initiate, on the government's behalf, suits that allege fraud in government

- 5 -

Star agreed to pay the government $1,900,000 and Horizon agreed to pay the government $1,500,000. For his part, Stallings received over half-a-million dollars as a whistleblower. See id. § 3730(d).

On April 18, 2014, the appellant moved for a new trial in his criminal case pursuant to Federal Rule of Criminal Procedure 33. He argued that the government's failure to inform him of Stallings's qui tam action offended the due process guarantees memorialized in Brady v. Maryland, 373 U.S. 83 (1963). The district court denied the motion without an evidentiary hearing. See Peake II, 2016 WL 8234673, at *11. The court reasoned that, in light of the "massive amount of independently incriminating evidence" introduced against the appellant at trial, there was no reason to believe that earlier disclosure of the qui tam action would have changed the outcome. Id. This timely appeal followed.

## II. ANALYSIS

In this venue, the appellant advances two assignments of error. First, he renews his contention that the government's nondisclosure of Stallings's qui tam action demanded a new trial, and he therefore faults the district court for denying his Rule 33 motion. Second, he contends for the first time that relief under Rule 33 is warranted because Puerto Rico should not be treated

---

programs. See 31 U.S.C. § 3730(b); see also United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 203 (1st Cir. 2016). The statute directs that such complaints be filed under seal. See 31 U.S.C. § 3730(b)(2).

like a state for the purposes of the Sherman Act. We address these contentions one by one.

### A. **The Nondisclosure Claim.**

Rule 33 authorizes the district court, on motion of a criminal defendant, to "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When, as now, a Rule 33 motion is made more than fourteen days after the verdict, it must be "grounded on newly discovered evidence." Fed. R. Crim. P. 33(b). Under ordinary circumstances, a defendant seeking such relief must satisfy four conditions: he must show that the specified evidence "was unknown or unavailable to him at the time of trial"; that the failure to discover such evidence was not the result of his "lack of diligence"; that "the evidence is material" and not "merely cumulative or impeaching"; and that "the evidence is such that its introduction would probably result in an acquittal upon a retrial of the case." United States v. Maldonado-Rivera, 489 F.3d 60, 66 (1st Cir. 2007) (citing United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980)).

This formulation is somewhat different if a movant colorably asserts that the government violated Brady. Under Brady, the government offends due process if it causes prejudice to the defendant by "either willfully or inadvertently" suppressing "exculpatory or impeaching" evidence in its custody or control that is "favorable to the accused." United States v. Connolly,

- 7 -

504 F.3d 206, 212 (1st Cir. 2007) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). A defendant who seeks to premise his motion for a new trial on a Brady violation must satisfy the first (unavailability) and second (due diligence) elements of the conventional test. See id. at 212-13. But the third and fourth elements (materiality and prejudice, respectively) are merged and "replaced with the unitary requirement" that the defendant need demonstrate only "'a reasonable probability that, had the evidence been disclosed to the defense'" in a timely manner, "'the result of the proceeding would have been different.'" Id. at 213 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)); see Kyles v. Whitley, 514 U.S. 419, 434 (1995).

This alteration in the Rule 33 framework eases a defendant's burden in two significant ways. For one thing, instead of having to demonstrate "actual probability that the result would have differed," the defendant need only point to "something sufficient to 'undermine[] confidence in the outcome of the trial.'" United States v. Mathur, 624 F.3d 498, 504 (1st Cir. 2010) (emphasis and alteration in original) (quoting Kyles, 514 U.S. at 434). For another thing, while impeachment evidence is ordinarily insufficient to show materiality in the Rule 33 context, see Connolly, 504 F.3d at 213, impeachment evidence that is undisclosed in violation of Brady may "suffice[] to undermine

confidence in the outcome of the trial" and, if so, warrant a new trial, Mathur, 624 F.3d at 504 (internal quotation marks omitted).

In applying these principles, we do not write on a pristine page. Rather, our review of a decision denying a Rule 33 motion must take into account that the district court "has a special sense of the ebb and flow of the . . . trial." Id. (internal quotation marks omitted). Consequently, we afford substantial deference to the district court's views regarding the likely impact of belatedly disclosed evidence and review its denial of a Rule 33 motion solely for abuse of discretion. See id.; Connolly, 504 F.3d at 211.

Here, the district court conducted a searching appraisal of the record and found no hint of cognizable prejudice stemming from the government's failure to disclose Stallings's filing of the qui tam action. See Peake II, 2016 WL 8234673, at *11. We explain briefly why this determination was well within the encincture of the district court's discretion.

It is uncontroverted that, at the time of trial, the appellant was unaware of Stallings's plan to file a qui tam action. Nor does the government suggest that the appellant's lack of awareness stemmed from any failure of diligence on his part. But even assuming that the government knew about such evidence and had

custody of it,[3] the appellant's claim founders on the district court's finding that he failed to show cognizable prejudice.

The appellant insists that, had he been aware of the qui tam action, he would have called Stallings to testify and would have elicited testimony regarding three data points: that a different Sea Star executive (Leonard Shapiro) consummated Sea Star's conspiratorial agreement with Horizon in 2002; that Baci (the appellant's subordinate) played a central role in the conspiracy; and that the appellant was not a participant in any of the seventeen conversations that Stallings recorded while acting under the government's auspices. None of these data points, though, had anything to do with the qui tam action. Moreover, none of them was controversial. The government never disputed that it was Shapiro who forged the fifty-fifty arrangement with Horizon in 2002 (indeed, the government itself introduced trial testimony to that effect). So, too, Baci testified at the trial

---

[3] We note that the appellant, in an apparent effort to prove that the information about Stallings's initiation of suit was within the government's custody and control, attached to his reply brief a series of 2012 e-mails between Stallings and the lead prosecutor. This proffer does not gain him any traction. After all, "evidentiary matters not first presented to the district court are . . . not properly before us." United States v. Kobrosky, 711 F.2d 449, 457 (1st Cir. 1983).

Relatedly, the appellant invites us to remand this matter to the district court so that he may explore what the government knew about Stallings's decision to file the qui tam action and when the government knew it. Since we have assumed, arguendo, that the government had custody and control over the information about Stallings's decision, remand would serve no useful purpose.

as a government witness and made clear that he managed the day-to-day details touching upon Sea Star's anticompetitive arrangement with Horizon. Last — but far from least — the government produced Stallings's seventeen recordings in discovery, and the appellant's counsel harped upon the appellant's absence from the recordings in his opening statement.

The short of it is that the appellant — who could have called Stallings as a trial witness but chose not to do so — fails to offer any coherent explanation as to why the existence of the qui tam action would have led him to reevaluate this decision. Put another way, the appellant has not articulated "any plausible strategic option" that the failure to reveal the existence of the qui tam action either "hampered or foreclosed." Mathur, 624 F.3d at 506. For aught that appears, knowledge of the qui tam action would not have benefited the defense in any meaningful way.

The appellant resists the district court's conclusion to this effect, mustering a litany of other possible uses that he might have made of the qui tam action (had he known about it). These are, however, shots in the dark — and none of them comes close to hitting the mark.

To begin, the appellant submits that he would have introduced the qui tam complaint into evidence. The complaint would have been useful, he suggests in hindsight, because of what it does not say (that is, it hardly refers to the appellant). But

- 11 -

this is whistling past the graveyard: the qui tam complaint contains two highly incriminating references to the appellant, which would have buttressed the government's theory that he was a moving force in the conspiracy.[4] Thus, introduction of the qui tam complaint into evidence would have tended to weaken, not strengthen, the appellant's lack-of-knowledge defense.

Next, the appellant argues that timely disclosure of the qui tam action would have enabled him to impeach Stallings regarding the latter's financial incentive to cooperate with the government. One flaw in this argument is that neither side called Stallings as a trial witness, so any such impeachment evidence would have been inadmissible. See United States v. Silva, 71 F.3d 667, 670-71 (7th Cir. 1995). And even assuming that Stallings had testified, any impeachment value arising out of the filing of his qui tam action would have been miniscule compared to the impeachment evidence that the appellant already had available (such as evidence of Stallings's hip-deep involvement in the conspiracy and his avoidance of potentially significant prison time through his cooperation with the government).

---

[4] The qui tam complaint alleges that any pricing matters that were not resolved between Baci and Glova "would be bumped up the chain of command to be addressed and resolved by" the appellant and Serra. Similarly, the complaint describes the 2006 Orlando meeting, during which Baci, Glova, Serra, and the appellant discussed implementation of the companies' anticompetitive market-share agreement.

Sounding a similar note, the appellant contends that he could have used the qui tam action to impeach Reynolds (the USDA agent) who testified for the government. Evidence of the qui tam action would have been useful to prove Reynolds's bias, the appellant insists, inasmuch as the appellant's conviction would have tended to increase the likelihood of a substantial recovery by the government in the qui tam action.

This contention borders on the frivolous. Reynolds's testimony was offered solely to prove that the conspiracy affected interstate commerce. See Peake I, 804 F.3d at 92, 96-97 (discussing Sherman Act's interstate commerce requirement). Accordingly, Reynolds's testimony was brief and limited to a narrow point: the impact that the conspiracy had on federal food assistance programs. Seen in this light, the impeachment value of the qui tam action vis-á-vis Reynolds would have been slim to none.

Grasping at straws, the appellant argues that knowing about the qui tam action would have propped up his unsuccessful motion to transfer the criminal case to the Middle District of Florida. This argument is hopeless. In the first place, the appellant never advanced this argument below and, as a general rule, "legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992). In the second place, the

- 13 -

propriety of venue is not material either to guilt or punishment. Cf. United States v. Lanoue, 137 F.3d 656, 661 (1st Cir. 1998) (noting that "[v]enue is not an element of the offense"). Consequently, information that is material only to a venue decision does not implicate Brady.

To say more on the prejudice point would be supererogatory. Common sense teaches that an undisclosed piece of evidence often looms larger in the eyes of a hopeful defendant than its actual dimensions warrant. In the Brady context, though, prejudice cannot be viewed in a funhouse mirror. Instead, it is a fact-specific phenomenon that must be gauged objectively in light of the circumstances of a particular case. It is not enough that a defendant thinks (or professes to think) that somehow, some way, his theory of defense would have prevailed had he been given timely access to the allegedly withheld information.

To sum up, we conclude that the district court's finding that the appellant suffered no cognizable prejudice from the delayed disclosure is fully supportable. The government's failure to disclose the qui tam action is "manifestly insufficient to place the trial record in 'such a different light as to undermine confidence in the verdict.'" Mathur, 624 F.3d at 505 (quoting Kyles, 514 U.S. at 435).

A loose end remains. The appellant argues, in the alternative, that the district court should have convened an

- 14 -

evidentiary hearing on his Rule 33 motion.  This argument contains more cry than wool.

We previously have explained that "evidentiary hearings on new trial motions in criminal cases are the exception rather than the rule."  Connolly, 504 F.3d at 220.  Where, as here, the trial court supportably concludes that a Rule 33 motion "is conclusively refuted . . . by the files and records of the case," such a hearing would be futile.  Id. at 219-20 (internal quotation marks omitted).  Given its intricate web of findings, we discern no abuse of discretion in the district court's declination to hold an evidentiary hearing on the appellant's Rule 33 motion.

## B.  **The Status Claim.**

The appellant has one last arrow in his quiver.  He complains that his conviction is invalid due to Puerto Rico's status.  This plaint builds on the uncontroversial premise that the statute of conviction (the Sherman Act) outlaws conspiracies "in restraint of trade or commerce among the several [s]tates."  15 U.S.C. § 1.  While acknowledging our case law holding that such a proscription applies to commerce between Puerto Rico and one or more states, see, e.g., Córdova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36, 38 (1st Cir. 1981), he exhorts us to reconsider this holding in light of the decision in Puerto Rico v. Sanchez Valle, 136 S. Ct. 1863, 1868 (2016)

(concluding that Puerto Rico is not a separate sovereign for the purpose of the Double Jeopardy Clause).

Even without dwelling on the fact that this claim is foreclosed because it was not raised below, see Superline Transp., 953 F.2d at 21, it is without force. Under Rule 33, a new trial motion filed more than fourteen days after the verdict — like this one — must draw its essence from "newly discovered evidence." Fed. R. Crim. P. 33(b). It is nose-on-the-face plain that a change in the law does not amount to newly discovered evidence within the purview of Rule 33. See United States v. King, 735 F.3d 1098, 1108-09 (9th Cir. 2013).

In all events, the appellant's claim is misdirected. The record in this case makes pellucid that the conspiracy in which the appellant participated involved more than commerce between a state and Puerto Rico. As we noted in affirming the appellant's conviction, the trial evidence showed that "the commerce affected by the conspiracy was not only between a state and Puerto Rico, but also among the states." Peake I, 804 F.3d at 86.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**