# United States Court of Appeals
## For the First Circuit

No. 21-1515

UNITED STATES,

Appellee,

v.

STEVEN TUCKER, a/k/a CHILL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Kayatta, Lipez, and Thompson,
Circuit Judges.

Megan A. Siddall, with whom Christina N. Lindberg and Miner Siddall LLP were on brief, for appellant.

Seth R. Aframe, Assistant United States Attorney, with whom Jane E. Young, United States Attorney, was on brief, for appellee.

February 23, 2023

THOMPSON, **Circuit Judge**. The defendant, Steven Tucker, appeals his convictions for sex trafficking of a minor (in violation of 18 U.S.C. § 1591), use of an interstate facility to promote unlawful activity (in violation of 18 U.S.C. § 1952), and maintaining a drug-involved premises (in violation of 21 U.S.C. § 856). In this direct appeal, Tucker raises two issues: (1) whether he was entitled to a mistrial after the trial judge dismissed two jurors just before the jury started deliberating, and (2) whether he is entitled to a new trial when, several weeks after the jury returned the guilty verdicts, the government disclosed that it had inadvertently withheld impeachment evidence about one of its witnesses. For the reasons we explain below, we affirm.

## Background

Before delving into the events on which the two appellate issues are based, we hit the highlights of the factual underpinnings of Tucker's counts of conviction to provide a wide-lens view of the conduct for which the jury found Tucker criminally culpable. See United States v. Laureano-Salgado, 933 F.3d 20, 24 (1st Cir. 2019) (explaining similar set up). We present "the pertinent facts in the light most agreeable to the verdict, deferring some details to our analysis of the issues raised on appeal." United States v. Blanchard, 867 F.3d 1, 3 n.1 (1st Cir.

2017) (quoting United States v. Savarese, 686 F.3d 1, 5 (1st Cir. 2012)).

The testimony at Tucker's four-day jury trial revealed that, between October 2013 and July 2014, Tucker ran a robust heroin trade and prostitution venture out of his address of record on Walnut Street in Manchester, New Hampshire. Serving as both a pimp and a drug dealer during this time, Tucker fed the heroin addictions of several women, incentivizing their sex work by withholding or providing heroin (as well as withholding or providing food) depending on their earnings from day-to-day. The testifying witnesses included a few of these women, all of whom were in recovery and struggling to stay sober.[1]

The women arranged the sex work through Backpage.com. Now defunct, the Backpage website had allowed any user to post advertisements for products or services, including under categories for "adult entertainment" or "escorts," with the postings sortable by geographic area.[2] Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 16 (1st Cir. 2016); see also United

---

[1] At the time of their testimony, the women had been sober for somewhere between several months to a couple of years. Most also testified that they had experience with cycles of sobriety and relapse.

[2] Backpage.com ceased to exist in 2018 after its chief executive agreed to shut it down as part of a plea deal he negotiated to resolve the conspiracy and money laundering charges filed against him in federal court. Maggie Astor, Guilty Pleas From C.E.O. of Backpage, N.Y. Times, Apr. 13, 2018, at A21.

States v. Blanchard, 867 F.3d 1, 4 (1st Cir. 2017). For $7 per post (paid with a prepaid Visa card Tucker provided), Tucker or one of the women posted an ad with their individual photo and phone number and then waited for the phone to ring to schedule a time to meet up. Many of the sexual encounters took place at Tucker's Walnut Street residence, others at hotels in Manchester, Massachusetts, or Rhode Island.

The roster of women working in Tucker's "stable"[3] included at least nine women with two or three of them working on any given day. When each sexual encounter ended, the women handed Tucker all or part of the money they had been paid, and he gave them heroin. At times, he also gave them money for clothes, rent, food, and cigarettes. One of the women estimated that she and the others completed around five "dates" per day on weekdays and "up to ten" on weekends, receiving hits of heroin from Tucker three or four times a day.

Shifting our attention to some of the individual relationships between Tucker and these women, Tucker and Jasmine[4] (the underage woman on whom the government based the trafficking-

---

[3] In this context, "stable" means "a group of victims who are under the control of a single pimp." Linda Smith, Renting Lacy: A Story of America's Prostituted Children xvii (Shared Hope International, 2009).

[4] The parties agreed at trial to refer to the witnesses by their first names. We follow suit.

- 4 -

of-a-minor count) first met when she was around 14 years old and he was dating her aunt. Approximately three years later, they ran into each other and exchanged phone numbers. At his invitation, Jasmine visited him at the Walnut Street house. Three days later she posted her first ad on Backpage. Jasmine, who had been sober before reencountering Tucker, started using heroin again -- courtesy of Tucker -- "to cover up the pain" of her sex work. In October 2013, Jasmine, while working for Tucker, turned 17 years old. Jasmine testified that Tucker knew her age at the time she worked for him; she told Tucker how old she was and said that he "[k]ind of avoided it" ("it" being the topic of her age). Haley, who both worked for Tucker and dated him during most of the time in question, had known Jasmine was only 17 years old and also testified that Tucker knew Jasmine's age and neither said nor did anything about it. Morgan, another sex worker who also had been in a relationship with Tucker (overlapping significantly with the same time period as Haley), also gave testimony about Tucker's knowledge of Jasmine's age. She told the jury that Tucker told her Jasmine was underage during an incident in which they had all been detained in a highway traffic stop and a needle and drugs had been found in the car they were in. Tucker had been angry with Jasmine for not taking the fall for them over the drug find, given her juvenile status.

After three days of witness testimony,[5] the jury was set to begin deliberating but got delayed because the trial judge found out that a couple of jurors made comments about the case to each other during the trial. We will lay out all the details soon -- for now it's enough to know that the trial judge investigated the information brought to his attention, dismissed two jurors, and denied a mistrial motion Tucker had filed because of the alleged juror misconduct. The jury returned guilty verdicts on all three indicted counts later that day. A few months later, the government revealed to the defense that it had inadvertently failed to disclose that one of its trial witnesses (Morgan) had been arrested before trial on a New Hampshire drug charge. The felony state charge had been pending at the time of Morgan's testimony and -- also at the time of trial -- the U.S. Attorney's Office had been considering whether to prosecute Morgan in federal court for the same alleged drug sale conduct. Based on this revelation, Tucker once again moved for a new trial, which, after a hearing, the trial judge denied. Now before this court, Tucker challenges the denials of each of these two motions. We start our work with the juror-related motion for mistrial.

---

[5] The other trial witnesses included other sex workers addicted to drugs, another Walnut Street house resident, the Walnut Street house property manager, Tucker's sister, and Tucker's nephew.

## Juror Comments

Bear with us as we summarize the sequence of conversations that led to Tucker's motion for mistrial; to provide the necessary context for Tucker's arguments we need to paint the full picture. By the end of the third day of trial, the defense rested, the trial judge provided instructions to the jury, both the prosecution and defense delivered their closing arguments, and the court chose the alternate jurors. The next morning, before deliberations got underway, one of the jurors brought a concern about another juror to the court's attention. Juror No. 1 apparently told another juror partway through Trial Day 3 that, on the day before he had reported for jury duty, he looked up the court schedule for the next day and, based on the schedule posted on the court's website, guessed he had been summonsed for jury duty in Tucker's case. He also commented that he thought the case was really old.

The court investigated by speaking with Juror No. 1, who admitted to looking at the district court's website the day before reporting and he saw a schedule that included jury selection for Tucker's case. He denied discussing the case with anyone after he was selected for Tucker's jury. He disclosed that he had deduced

the age of the case from the testimony about the events which had taken place in 2013 and 2014 (the trial was held in March 2019).

At defense counsel's request, the judge spoke with each of the other seated jurors to determine whether they'd had any conversations with Juror No. 1. Two of the remaining seated jurors relayed that they had overheard another juror commenting about looking up the court schedule, but had not known which juror had spoken at the time or to whom. After the judge and the attorneys discussed what they had learned, the judge -- at Tucker's request and over the government's objection -- dismissed Juror No. 1. The judge did so because this juror's demeanor during the court's questioning of him had appeared defensive -- at times combative -- and the judge was concerned that the questioning process may have "impacted [Juror No. 1's] duty to be fair and impartial."

The court then questioned the first alternate juror (Juror No. 4) to ensure she was still qualified. In response to the court's inquiry about whether she knew if any jurors had violated the court's instructions about not discussing the case or accessing media, she said that, one day at the lunch break, as the jurors were walking out of the courtroom, Juror No. 7 -- who Juror No. 4 perceived throughout the trial to be "agitated" and "intense" -- said to another male juror: "I can't believe that. That witness was . . . ." But before Juror No. 7 could complete his thought Juror No. 4 told him to stop talking, and he did. Juror

No. 4 also reported that, the day before, the same Juror No. 7 said "we should be able to wrap this up today" in a tone she understood to mean he thought the outcome was very clear. Juror No. 4 also heard Juror No. 7 make a "derogatory" comment about defense counsel and when he did several jurors told him to be quiet. Juror No. 4 insisted that overhearing these comments had not affected her ability to be fair and impartial.

Based on this new information, the trial judge suggested to the defense counsel and prosecutors that he again speak with each juror individually to inquire about the comments Juror No. 4 reported overhearing. In response, defense counsel moved for a mistrial, asserting that Juror No. 7 had tainted the entire jury pool. Counsel argued that the juror clearly had made up his mind and was expressing his thoughts to other jurors, had indicated he wanted to get the trial over with, and had been described in general as one who could have an aggressive approach during deliberations, all of which resulted in jury corruption. The government objected, commenting that defense counsel was blowing two isolated comments out of proportion. The court reserved its ruling until after it had an opportunity to "examine the other jurors" to investigate and assess whether this one juror "had impact enough that even excusing him would not be sufficient to alleviate any problems he may have caused."

When called to speak with the judge and the parties, Juror No. 7 said he had made a comment that he thought the jury would "be here for a while" but denied making any comments about the lawyers in the case or their performances. The court did not confront him directly with the statements Juror No. 4 had relayed -- an approach both parties agreed was prudent so Juror No. 7 would not be placed in a defensive posture. The examination of the remaining jurors did not turn up any other venire members who had heard Juror No. 7's purported comments. Nonetheless, defense counsel renewed his motion for a mistrial, claiming one of the jurors must have been lying. The court disagreed, labeling Juror No. 4's report about Juror No. 7's comments "amorphous."

Backing up briefly to the court's second round of speaking with each juror, Juror No. 9 did say that she'd overheard two jurors (Nos. 1 and 11) commenting that some of the questions defense counsel asked the witnesses sounded redundant. By this point, Juror No. 1 had already been dismissed, so the court only followed up with Juror No. 11 -- the second alternate -- who did admit to commenting at some point about the redundancy of some of defense counsel's questions. Tucker then insisted that a mistrial was warranted because the factual inconsistencies which emerged from the judge's inquiry of each juror about who said what and when and which juror overheard something meant that "the jury has been, you know, deliberating in some cases out loud" and Juror No.

11 (the alternate who could replace Juror No. 7) had herself made a comment about the redundancy of the defense counsel's questioning. In the alternative, the defense requested the court discharge Juror No. 7. The government countered there was no indication Juror No. 7 had engaged in any actual misconduct.

The trial judge ultimately denied the motion because, after speaking with each juror twice, he was "thrilled" to discover that "they followed the instructions as carefully as human beings can generally be expected to follow them" given that it's not "unusual for one juror to mention to another that something is monotonous . . . I'm not surprised that occasionally a sideline comment is made about a witness or about a lawyer and a lawyer's effectiveness." The judge discussed each of the comments the jurors alleged they heard and concluded there had been no juror misconduct because either the comment couldn't be conclusively interpreted as pro or con prosecution or defense, the alleged comment was not corroborated by any other panel member, or the comment was an innocuous observation that any juror may have made. In the judge's view, Juror No. 4 had drawn a lot of inferences based on just a few words spoken by Juror No. 7, and whatever Juror No. 7 said hadn't influenced any of the other jurors. In the judge's words:

> So I didn't see anything in these discussions with the
> jurors today that amounted to being in my view juror
> misconduct or manifest necessity, which is a

circumstance involving juror misconduct, among other things, which is of such an overwhelming and unforeseeable nature that the conduct of the trial or reaching a fair result is impossible and which necessitates the declaration of a mistrial. I don't think we've reached that point here.

He did grant the alternative relief Tucker requested, dismissing Juror No. 7 over the government's objection though "not based on misconduct but more I guess I would call it in an abundance of caution." The judge also found Juror No. 11 qualified to replace Juror No. 7.

That backdrop in place, before this court Tucker argues that the trial judge abused his discretion when he denied the mistrial motion. Before examining Tucker's specific contentions on this issue, we provide a quick primer about how trial judges are to handle suspected juror misconduct. The overarching principle is that "an impartial jury is an integral component of a fair trial and must be jealously safeguarded." United States v. Maldonado-Peña, 4 F.4th 1, 38 (1st Cir. 2021), cert. denied Rivera-Alejandro v. United States, 142 S. Ct. 729 (2021), and cert. denied Rivera-George v. United States, 142 S. Ct. 1184 (2022), and cert. denied Rivera-Alejandro v. United States, 142 S. Ct. 1185 (2022) (quoting Sampson v. United States, 724 F.3d 150, 160 (1st Cir. 2013)). Therefore, "the trial court has a duty to investigate [an] allegation [of jury taint] promptly," United States v. Therrien, 847 F.3d 9, 17 (1st Cir. 2017) (quoting United States v.

Bradshaw, 281 F.3d 278, 289 (1st Cir. 2002)), determining first "whether a taint-producing event actually occurred and, if so, the extent or pervasiveness of the resulting prejudice," id. (citing United States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990)). "If the trial court finds both a taint-producing event and a significant potential for prejudice, it must then consider possible measures to alleviate that prejudice." Id. (citing Bradshaw, 281 F.3d at 289). "If the potential for prejudice remains too high even after the trial court's best efforts, then the court must grant any resulting motion for a mistrial." Id. (citing Bradshaw, 281 F.3d at 289). However, "[g]ranting a defendant's request for a mistrial is 'a last resort, only to be implemented if the [jury] taint is ineradicable.'" Id. (quoting United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993)) (second alteration in original).

"When reviewing the denial of a mistrial request, we . . . 'consider the totality of the circumstances to determine whether the defendant has demonstrated the kind of clear prejudice that would render the court's denial of his motion for a mistrial a manifest abuse of discretion.'" Id. (quoting United States v. Trinidad-Acosta, 773 F.3d 298, 306 (1st Cir. 2014)). In other words, "[s]o long as the district judge erects, and employs, a suitable framework for investigating the allegation and gauging its effects, and thereafter spells out [his] findings with adequate

- 13 -

specificity to permit informed appellate review, the court's 'determination deserves great respect and should not be disturbed in the absence of a patent abuse of discretion.'" Maldonado-Peña, 4 F.4th at 38-39 (quoting United States v. French, 977 F.3d 114, 122 (1st Cir. 2020)) (cleaned up).

Tucker primarily attacks the trial judge's denial of the motion for mistrial in two ways. First, he contends the trial judge used a standard (that of "manifest necessity") that is not applicable when -- as here -- the defendant is the party seeking the mistrial.[6] Second, Tucker asserts the trial judge made the wrong call about the absence of actual juror misconduct and the lingering effect of the jurors' comments on the remaining jurors. We'll start our work on this issue with Tucker's claim that the trial judge applied the wrong standard to the mistrial motion.

As summarized above, the trial judge provided a detailed take on why he was denying Tucker's motion for mistrial, articulating his reasoning why he found no juror misconduct or "manifest necessity," but dismissing two jurors anyways. Tucker zeroes in on the judge's use of the phrase "manifest necessity."

---

[6] Manifest necessity is the standard applied to determine whether the government is entitled to a mistrial over the defendant's objection. See United States v. McIntosh, 380 F.3d 548, 553 (1st Cir. 2004). "[T]he Double Jeopardy Clause . . . bar[s] retrial of a defendant after a mistrial ordered over the defendant's objection unless the mistrial was occasioned by manifest necessity." Id.

- 14 -

This phrase is relevant when a court must determine whether the Double Jeopardy clause of the U.S. Constitution bars a retrial after a mistrial is ordered over a defendant's objection; double jeopardy principles do not bar a retrial, however, when "the mistrial was occasioned by manifest necessity" -- e.g., a hung jury. United States v. Brown, 426 F.3d 32, 36 (1st Cir. 2005) (quoting United States v. McIntosh, 380 F.3d 548, 553 (1st Cir. 2004)). When a defendant is the party requesting a mistrial then he or she is "ordinarily . . . deemed to have waived any subsequent claim of double jeopardy" and so the manifest necessity standard does not come into play. McIntosh, 380 F.3d at 554; see United States v. Dinitz, 424 U.S. 600, 607 (1976) (stating "[d]ifferent considerations obtain . . . when the mistrial has been declared at the defendant's request"). Here, Tucker moved for the mistrial, so he is correct -- the manifest necessity consideration is not applicable here.

But our analysis does not end there. The record reveals a couple of hitches with Tucker's attack on the trial judge's use of this inappropriate standard as an error: Not only did he not object to the use of this standard below, he (as the government points out) actually invited the judge to use it, kicking off his argument for a mistrial with "Frankly, you know the standard is manifest necessity." The trial judge's mention of the standard was clearly invited by the defense and Tucker may not now benefit

from an invited error. See United States v. Gottesfeld, 18 F.4th 1, 12-13 (1st Cir. 2021) (concluding waiver applied to an appellate argument about why an attorney's motions to withdraw should have been granted after the defendant/appellant had asked the trial judge to deny these motions); United States v. Amaro-Santiago, 824 F.3d 154, 160 (1st Cir. 2016) (rejecting the defendant's challenge on appeal to the trial court's delayed issuance of a curative instruction because the defendant had asked the court to hold off until the next day). Regardless, the trial judge did not rely solely on determining whether there was "manifest necessity" for a mistrial. Rather, he reasoned through all the information before him, concluded there was no misconduct, implemented corrective measures out of (his words) "an abundance of caution," and determined the remaining jurors were not influenced by the comments of the dismissed jurors.[7]

---

[7] Anticipating the government's response to his challenge to the standard on which he contends the trial judge impermissibly relied, Tucker also argues that the government waived any argument that the trial judge adjudicated the motion for mistrial using the appropriate standard. This is so because, according to Tucker, the government suggested to the trial judge that this court could decide the juror misconduct issue in the first instance. We read the record differently. The government, while arguing against the defendant's bid for a mistrial, asserted that whichever way the trial judge ruled there would be no downside to Tucker -- i.e., if the court granted the motion then Tucker would get a retrial, and if the court denied the motion then the issue was undoubtedly preserved for appeal so if this court decided the trial judge abused his discretion then Tucker would get a retrial. The government was not asking the trial judge to punt the issue to this court to take the first pass on it. Moreover, as the

Shifting to Tucker's second line of attack on the denial of his juror related mistrial motion, he asserts that even if the judge could be viewed as having applied the right standard, his finding that there was no juror misconduct was clearly wrong because "[t]here is evidence in the record that some jurors engaged in predeliberation or were biased and that others were exposed to that predeliberation and bias." Tucker highlights the trial judge's discussion of three statements allegedly made by Juror No. 7 that were -- as the judge put it -- "problematic enough to require our attention": (1) that "the case should wrap up quickly," (2) a "disparaging comment about defense counsel" in comparison to the prosecutors, and (3) the incomplete statement of "I can't believe that. That witness" before Juror No. 4 shut him up. The way Tucker sees it, these three statements indicated prejudice against the defense and the trial judge could not be confident the other jurors were not affected by these comments. So, from Tucker's vantage, the judge should have concluded there was misconduct.

---

government states in its responsive brief, if the trial court had understood the government to be requesting that it punt on the issue, the trial judge clearly did not embrace this suggestion. The judge's denial of the mistrial motion was based on his conclusion that there was no misconduct but that it could and did take remedial measures to remove any possible taint from the jurors who had made comments heard by others.

Tucker also argues that the remedial measures taken by the judge -- excusing the two jurors and asking the remaining jurors if they could remain impartial -- failed to cure the problem. As his reasoning goes, the judge could not be 100% sure that the comments did not affect the remaining jurors and therefore the taint could not be completely cured.

The government rejoins that even if the judge was clearly wrong to conclude there was no juror misconduct, there was no effect on Tucker because the judge dismissed the two offending jurors. The government also points out that the judge conducted a thorough investigation into the allegations about the comments and found no evidence that other jurors were affected.

Our review of the record shows that the trial judge carefully considered the comments that Juror No. 4 reported she overheard Juror No. 7 utter and reasonably concluded there were "a lot of inferences and leaps involved in that that are not explicit in the record and that were not corroborated by any other juror." We note that while Juror No. 4 reported that several jurors shushed Juror No. 7 after she heard him make a disparaging comment about defense counsel, none of the other jurors, when asked, said they heard the comment. And all reaffirmed their ability to render a fair and impartial verdict.

Our review of the record also shows the trial judge bent over backwards, likely doing more than was minimally necessary

when a credible claim of jury misconduct is brought to the court's attention. With diligence and sensitivity, he questioned each juror at least twice and thoughtfully considered whether the information his inquiries unearthed meant Tucker was entitled to a mistrial. In addressing Tucker's concerns, he reasonably exercised his discretion to excuse two jurors -- eliminating the potential for them to behave improperly during deliberations. Further, we perceive no patent abuse of discretion with his ultimate conclusion that the remaining jurors were still qualified to deliberate and that mistrial was unwarranted. He even went so far as to read the transcript of his conversation with Juror No. 11 to himself and then into the record before securing both parties' agreement that Juror No. 11 was qualified to deliberate as a member of the jury. See Therrien, 847 F.3d at 18 ("Given the circumstances, we are reassured that the trial court's inquiry and repeated warnings effectively ascertained the extent and degree of any prejudice suffered by Therrien, mitigated the effects of that prejudice, and was 'appropriate and reasonable.'" (quoting United States v. Balsam, 203 F.3d 72, 86 (1st Cir. 2000))); see also Maldonado-Peña, 4 F.4th at 39-40 (concluding the trial judge's careful and thoughtful consideration of a jury's potential bias revealed through a note sent to the judge during trial resulted in a "reasonable and appropriately measured" response); Therrien, 847

F.3d at 18 n.11 (collecting cases addressing a trial judge's abuse of discretion vel non in denying a motion for mistrial).

On the whole, the reported juror misconduct was quite minimal. As the experienced trial judge aptly observed, it is hardly a cause for any heightened concern that a juror might briefly comment about the lawyers or the pace of the trial. There was no suggestion that any juror was biased against any group or person. Nor was there a suggestion that a juror misled the court in voir dire. Nor was there any claim that material, extra-record information was involved.

### Suppressed Impeachment Evidence

In Tucker's second challenge to his convictions, he says he was entitled to a new trial because the government had suppressed impeachment information about one of its witnesses.

This information came to Tucker's attention when, a couple of months after the jury returned the guilty verdicts, Tucker sent a written request to the government for "evidence probative to all sentencing issues." In its written response, the government (memorializing a phone call it had already made to defense counsel) disclosed that it had "inadvertently failed to disclose possible impeachment information about" Morgan (who, recall, testified about dating and working for Tucker as well as about the other women who worked for him). The government explained that the prosecutors had known prior to the trial that

Morgan "had been arrested on state drug charges by the Manchester, NH Police Department" but, at that time, had not intended to call her to testify at Tucker's trial and so had not included her on its witness list or disclosed her arrest to Tucker.  A week before trial, the government decided to call Morgan to testify but, "in the whirlwind of trial preparation," forgot to disclose the state arrest and charge information to Tucker.  The letter also explained that, approximately six weeks after trial, one of the federal prosecutors noticed Morgan's name on an initial appearance hearing calendar in the federal courthouse and "learned for the first time" that his office had filed an indictment against Morgan based on the state charge for the sale of one gram of fentanyl to one of Manchester police's confidential sources.

In response, Tucker filed a motion for new trial pursuant to Federal Rule of Criminal Procedure 33,[8] asserting that the failure to disclose Morgan's pretrial arrest, state charge, and possible prosecution by the federal government[9] violated the

---

[8] Rule 33 of the Federal Rules of Criminal Procedure allows the district court, "[u]pon the defendant's motion" to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The discovery of new evidence falls squarely within this rule and "must be filed within 3 years after the verdict."  Fed. R. Crim. P. 33(b)(1).  Tucker timely filed his motion 7 months after the jury returned the guilty verdicts.

[9] Morgan's state felony charge was referred to the U.S. Attorney's Office shortly after her arrest by the Manchester Police Department, but the federal prosecutors (different prosecutors to

government's obligations under Brady and Giglio,[10] and arguing that if this impeachment evidence had been disclosed prior to trial then Tucker would have had a reasonable likelihood of a not guilty verdict.[11]  The government did not dispute that it suppressed "potential impeachment evidence" about Morgan but stressed the "inadvertent" nature of the suppression and contended Tucker had not been prejudiced by the nondisclosure because the evidence had little impeachment value when examined against the trial judge's pre-trial evidentiary rulings (in which he indicated he would allow cross-examination about witnesses' prior convictions and pending

_____

the ones responsible for Tucker's prosecution) did not decide to pursue a federal charge against her until after Tucker's trial ended.

[10] "Under Brady, the government offends due process if it causes prejudice to the defendant by 'either willfully or inadvertently' suppressing 'exculpatory or impeaching' evidence in its custody or control that is 'favorable to the accused.'" United States v. Peake, 874 F.3d 65, 69 (1st Cir. 2017) (quoting United States v. Connolly, 504 F.3d 206, 212 (1st Cir. 2007)); see Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  As we've observed, in Giglio v. United States, 405 U.S. 150, 154 (1972), "the Supreme Court applied Brady's disclosure obligation to 'information potentially useful in impeaching government witnesses.'"  United States v. Calderón, 829 F.3d 84, 88 n.3 (1st Cir. 2016) (quoting United States v. Misla-Aldarondo, 478 F.3d 52, 63 (1st Cir. 2007)).

[11] Tucker also argued in his Rule 33 motion that he was entitled to a new trial on the combined basis of the Giglio violation, other alleged less-than-timely discovery disclosures prior to trial, trial counsel's allegedly deficient performance during Morgan's cross-examination, and allowing all the witnesses to be referred to by their first names only.  These other alleged grounds for Tucker's motion are not carried forward in his appellate arguments.

charges but not prior arrests), the admitted impeachment evidence, and other overwhelming testimony corroborating Morgan's.

Following a hearing, the trial judge denied Tucker's motion, acknowledging the failure to disclose the pending charges against Morgan likely denied Tucker "the opportunity to truly cross [her] about that pro-[g]overnment bias" but also stating that these impeachment points "would [not] have been significantly augmented by cross-examination using the inadvertently withheld evidence." The judge concluded that:

> [F]urther evidence about a pending charge wouldn't have added much to Tucker's impeachment of Morgan's credibility [because t]here was already evidence that she was testifying under immunity both on direct and cross[,] . . . evidence that she lied to . . . [p]olice, that she had a drug addiction, . . . was a drug addict, had a prior conviction on her record.

In addition, he found that Morgan's testimony had been "significantly corroborated" for each element of the three charges against Tucker. The judge also expressed his frustration at the sequence of events that led to the inadvertent suppression of the evidence and the resulting questions the defendant and the public could reasonably have about the fairness of the trial process, even though his confidence in the outcome of the trial ultimately was not shaken.[12]

---

[12] We agree. Of the two issues Tucker brings to us this one is more troubling. Tucker spills a little ink arguing that the trial judge should not have denied the new trial motion because the judge himself thought Tucker was entitled to a new trial.

On appeal, Tucker asserts the trial judge's decision to deny the new trial motion was simply wrong. In our review of Tucker's claimed error, we review the trial judge's denial of a new-trial motion for abuse of discretion, finding such "only when no reasonable person could agree with the judge's decision." Laureano-Salgado, 933 F.3d at 29. "This is as it should be," id., the trial judge "has a special sense of the ebb and flow of the trial . . . [so] we afford substantial deference to the [judge's] views regarding the likely impact of belatedly disclosed evidence," United States v. Peake, 874 F.3d 65, 70 (1st Cir. 2017) (deletion and citations omitted). "We also keep in mind that the new-trial remedy 'must be used sparingly, and only where a miscarriage of justice would otherwise result.'" Laureano-Salgado, 933 F.3d at 29 (quoting United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001)).

To prevail on a new-trial motion based on newly discovered evidence, ordinarily the defendant must show "that the

---

Tucker is referring to the judge's comment that "if it were . . . 'up to me' I'd order a new trial." The way Tucker interprets this comment, the judge thought "there was a reasonable probability of a different result." But when the judge's full comment is read in the context of his decision denying Tucker's motion for a new trial, it's clear this statement was part of his express frustration with the prosecutors and with the situation created by their unintentional suppression of the impeachment evidence, and that the judge was simply acknowledging that a feeling of unfairness could linger for Tucker.

evidence (1) was either unknown or unavailable to him during the trial; (2) could not have been uncovered sooner with diligence; (3) is material, not just cumulative or impeaching; and (4) is sufficiently compelling that it would probably produce an acquittal at a retrial." Id. at 28 (string citing cases parroting this well-established standard). This court has acknowledged this is "a hefty burden" for the defendant. Id. When, however (and as here), the defendant's new-trial motion is based on an alleged Brady or Giglio violation, the third and fourth prongs are merged and tweaked, creating a more defendant-friendly standard for showing the defendant's prejudice. To be sure, the defendant "must still satisfy the first and second elements (unavailability and due diligence)," but "the third and fourth elements (materiality and prejudice) [are replaced] with 'a unitary requirement that the defendant need demonstrate only a *reasonable probability* that, had the evidence been disclosed to the defense in a timely manner, the result of the proceeding would have been different.'" Id. at 28-29 (quoting Peake, 874 F.3d at 69). "So rather than having to show '*actual* probability that the result would have differed,' a defendant need show only 'something sufficient to undermine confidence' in the jury's verdict." Id. at 29 (quoting United States v. Mathur, 624 F.3d 498, 504 (1st Cir. 2010)) (additional internal quotation marks and citation omitted).

Both sides agree that the first two elements (evidence was unknown to the defendant during the trial through no lack of diligence on his part) are met. The point of contention centers on the merged inquiry into materiality and prejudice and whether there is a reasonable likelihood that the outcome of the trial would have been different if Morgan's pending state charge and potential prosecution by the feds had been disclosed prior to trial. As the parties argue, this merged materiality/prejudice inquiry turns on four factors distilled from our previous discussions and assessments of the "reasonable likelihood" standard: Whether the impeachment evidence (1) is strong, (2) impeaches on a collateral issue, (3) is cumulative of other evidence on the record, and (4) the impeachable witness's substantive testimony is corroborated by other evidence in the record. See United States v. Paladin, 748 F.3d 438, 444-48 (1st Cir. 2014). As we have said before, "[t]he strength of impeachment evidence and the effect of suppression are evaluated in the context of the entire record to determine materiality," id. at 444 (citing Conley, 415 F.3d at 189), "[e]vidence is immaterial where it is cumulative or merely impeaches a witness on a collateral issue," id. (citing United States v. Dumas, 207 F.3d 11, 16 (1st Cir. 2000)), and "suppressed impeachment evidence has little probative value if additional evidence strongly corroborates the witness's

testimony the suppressed evidence might have impeached," id. (quoting Conley, 415 F.3d at 189).

Tucker argues each factor cuts in his favor; the government disagrees for all but one factor. We start our discussion with the factor on which the parties do agree: that the suppressed impeachment evidence was not collateral. Evidence is collateral when it is not "relevant for a purpose other than mere contradiction of the . . . [witness's] . . . in-court testimony." Id. at 448 (quoting United States v. Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993)). This court has indicated, however, that a "witness's self-interest or motive to testify falsely is generally considered to be a non-collateral issue." Beauchamp, 986 F.2d at 4. Tucker contends that the suppressed impeachment evidence was not merely collateral because it went directly to Morgan's credibility as a key witness and that, without this impeachment evidence, the jury was left with the misleading impression that she had no ongoing motive for bias in favor of pleasing the government. The government agrees that the suppressed information here is not collateral. We agree with the parties, see id., and move on.

The strength of the suppressed evidence factor considers whether the impeachment value is "merely marginal." Paladin, 748 F.3d at 444 (quoting Mathur, 624 F.3d at 505). If the value is marginal, then the withheld evidence will be "manifestly

insufficient to place the trial record in 'such a different light as to undermine confidence in the verdict.'" Id. (quoting Mathur, 624 F.3d at 505). Tucker again asserts that the suppressed impeachment evidence would have revealed the depth of Morgan's potential for bias in that Tucker was denied the opportunity to argue "that her criminal conduct was ongoing and that she had a reason to shade her testimony in favor of the government." He says that the district court was wrong to conclude that the suppressed evidence wouldn't have increased any doubt of Morgan's credibility because a motive for bias at the time of the trial testimony is different than other forms of bias inherent to a witness as a result of their life experiences (e.g., Morgan's drug addiction and previous convictions).

For its part, the government contends that the potential impeachment value of the suppressed evidence was "weak" because the jury actually heard Morgan had a pending felony charge at the time of her testimony (though not the nature of the charge or that it was a state case and not (yet) also a federal prosecution) and her acknowledgment that her testimony in this case wouldn't affect the result of that pending charge. Here's how some of the questioning played out at trial: At the beginning of Morgan's testimony, the government asked her about her criminal history.

> Q. Now, you have a conviction for felony possession of drugs; is that right?
> A. Yes.

Q. And was there an occasion in Las Vegas where you gave a false name to a law enforcement officer?
A. Yes.
Q. And you currently have a pending felony, right?
A. Yes.
Q. And is it your understanding that no promises are being made in exchange for your pending felony?
A. Yes.
Q. So, you understand that your testimony today is not going to impact that, right?
A. Yes.

. . .

Q. Okay. So, Morgan, I'm going to ask you some questions that, if you answer them truthfully, may incriminate you.
A. Okay.
Q. And you are aware that you've been given immunity today, right?
A. Yes.
Q. So, you won't be prosecuted for what you testify about today. Do you understand that?
A. Yes.
Q. But you also understand that you must testify truthfully today?
A. Yes.

In addition, partway through Morgan's direct testimony, she answered questions about the time New Hampshire police pulled over a car she was riding in and she "got arrested with [Tucker's] drugs."

Tucker's cross-examination did not ask any follow-up questions about her conviction or pending felony charge. Instead, the cross focused on Morgan's activities while working for Tucker and primarily explored why she had not told the police (when she had contact with them) about the harm she claimed she suffered

from him as well as whether she worked for another pimp during the same time period she worked for Tucker.

Responding to Tucker's assertions about the strength of the suppressed impeachment evidence, the trial judge called it "not particularly strong," a characterization we agree with given that the jury heard the fact of the pending felony charge and Tucker had an opportunity (even if he didn't use it) to explore it during cross.  See Paladin, 748 F.3d at 444 (confidence in a verdict is not undermined by suppressed impeachment evidence of marginal value).  The trial judge next examined whether the new information was cumulative of impeachment evidence in the trial record or whether Morgan's testimony was significantly corroborated.  We examine these factors next.

Starting with cumulativeness, "[s]uppressed evidence that is cumulative of evidence presented at trial is immaterial." Paladin, 748 F.3d at 446 (quoting United States v. Avilés-Colón, 536 F.3d 1, 19 (1st Cir. 2008)).  The inquiry here focuses on whether the witness to whom the withheld impeachment evidence applies was "already impeached at trial by the same kind of evidence."  Id. (quoting Conley, 415 F.3d at 192) (deletion and emphasis omitted).

Tucker argues the suppressed information about Morgan's pending charge was not cumulative of other impeachment evidence presented at trial as the government itself asked Morgan whether

- 30 -

she had any prior convictions or contact with the justice system. Morgan answered by admitting to a few prior run-ins with the law. She acknowledged a prior conviction for felony possession of drugs, a time when she had given a false name to a police officer in Vegas, and to a pending felony charge, though the government did not ask for details of any of these contacts with the justice system and Morgan did not offer any additional details. Tucker homes in on the difference between using a prior conviction to impeach Morgan's credibility and a pending prosecution as motive for testifying in a way that will please the government. The pro-government bias is even worse here, says Tucker, because the same office prosecuting Tucker had been considering prosecuting Morgan for the conduct underlying the state felony drug charge that Morgan knew was pending at the time of trial. Tucker insists that his trial defense counsel would have structured Morgan's cross-examination differently had this key impeachment evidence not been suppressed.

Not so fast, counters the government. Morgan could only be biased in favor of making a good impression on the federal prosecutors if she knew they (or their office) were considering their own prosecution based on the alleged conduct underlying her pending state charge, but there was no indication that she knew before or during her trial testimony that her state charge had been referred to the U.S. Attorney's office. Regardless, continues

the government, the jury knew Morgan was testifying under an immunity agreement,[13] so it was aware that Morgan had a current relationship with the prosecution and a reason to curry favor with it. The additional information about the possibility of a federal charge was therefore, according to the government, cumulative of all the other impeachment fodder indisputably on the record.

We believe the government has the better argument here. Whether or not Tucker picked up on the pending felony inquiry during Morgan's direct examination, he knew about the immunity agreement and the potential bias this could create because Morgan would be motivated on this front to keep the government happy.[14]

---

[13] The trial judge provided a special instruction to the jury after Haley's testimony and before Morgan's about what it means to testify under the promise of immunity and reiterated the instruction after Morgan's testimony: "[Y]ou should determine whether or not the witness's testimony has been colored in any way because of the grant of immunity."

[14] We also note that the trial judge explicitly indicated pending charges were ripe fodder for challenging a witness's credibility during cross-examination. During the final pre-trial conference, the trial judge (when discussing the admissibility of prior convictions and pending charges) said that "pending charges go to bias, go to credibility, even if it's in another jurisdiction. . . . [I]t's fair cross-examination to ask a witness if they are facing criminal charges somewhere and the usual follow-up about wanting to curry favor with law enforcement. . . . [Y]ou can inquire as to pending charges on cross-examination but not as to the nature of those charges." Morgan testified two days later. There is no doubt that Tucker had several bases for impeaching Morgan's credibility. That he did not either explore or exploit the information about her then-pending charge does not help Tucker meet his burden to show a reasonable probability that had the suppressed evidence been revealed before or during trial, the jury

See Paladin, 748 F.3d at 447 ("A prejudicial Brady violation has not been effected, however, where the defendant already had available to him evidence that would have allowed for impeachment on the same or similar topics.") As in Paladin, the details (if deemed admissible at trial) about Morgan's pending state felony and referral to the federal prosecutors for consideration "would have permitted one additional avenue to accomplish" showing the jury that Morgan had a motive to testify in a way to please the government and was, thus, not a credible witness. See id. We therefore agree with the trial judge's conclusion that the suppressed evidence was cumulative of other impeachment evidence.

We proceed now to the last factor of our four-point inquiry: Corroboration. As we mentioned above, "[s]uppressed impeachment evidence has little probative value if additional evidence strongly corroborates the witness's testimony the suppressed evidence might have impeached." Id. at 448 (quoting Conley, 415 F.3d at 189). Tucker stresses that Morgan's testimony was crucial to the count for trafficking of a minor because she was the only witness to provide any detail about how Tucker knew or should have known that Jasmine was a minor during the time

_____

would have reached a different verdict. See Paladin, 748 F.3d at 447.

- 33 -

period in question.[15]  The government responds that both Jasmine and Haley provided corroborative testimony that Tucker knew Jasmine was underage, so the jury could easily have reached the same verdict even if it ultimately discredited Morgan's testimony. Let's take a look at what evidence the trial produced on the issue of corroboration.

As we summarized above, Morgan testified that Tucker told her Jasmine was only 17 years old after the three had been stopped on the highway and Morgan got arrested for the drugs found in the backseat of the car.  Tucker was "pissed" because the needle found in the backseat had been Jasmine's, but she hadn't fessed up to claim ownership.  Morgan understood from Tucker that had Jasmine owned up then she wouldn't have been in much trouble because of her age (i.e., she would have been treated as a juvenile offender). When Jasmine was on the stand, she testified that she had told Tucker her age and he "kind of avoided it."  Haley, for her part, testified that when she learned Jasmine was underage, she tried to talk to Tucker about it but he "told me that she was of age and I

---

[15] During the trial judge's oral decision denying Tucker's motion for new trial, he went through each element of each count and stated which witness had also provided testimony from which the jury could have concluded the element had been met.  As the government points out, Tucker only argues about the lack of corroboration with respect to the knowledge element of the trafficking-of-a-minor count, so we follow his lead and examine whether there was in fact corroborating testimony on this element only.

got into an argument with him."  She then stated she was present when he did find out Jasmine was in fact underage and said he did not do anything with the information.

Tucker tries to convince us that Haley and Jasmine's testimonies cannot be considered corroborative of Morgan's testimony because Morgan provided greater detail about Tucker's knowledge.  While neither Haley nor Jasmine provided a detailed context for Tucker knowing Jasmine was underage, each directly stated that she was present when he learned Jasmine's age.[16]  This is consistent with Morgan's testimony that, during the relevant time period, Tucker knew Jasmine's age, even if not exactly duplicative of his acknowledgement of his knowledge.  The absence of the detail in Haley's and Jasmine's testimonies does not detract from their uncontroverted statements that Tucker knew Jasmine's age and corroborated Morgan's testimony on this point.[17]

---

[16] When the trial judge discussed the testimony in the record that corroborated Morgan's, he mentioned Haley "testif[ied] that Jasmine couldn't buy cigarettes because she was under 18," but, as Tucker has been quick to point out, this is a part of Haley's testimony to which the judge had sustained an objection on hearsay grounds.  Tucker suggests this was a clearly wrong finding of fact on which the trial judge relied.  A close look at Haley's testimony reveals she made that comment when she was describing when and how she knew Jasmine was underage.  So the judge's misrecollection of the record has no bearing on what Tucker knew and when, but Haley's other (and admitted) testimony corroborated Morgan's about the fact of Tucker's knowledge.

[17] We also acknowledge that, during cross-examination of these witnesses, Tucker's trial counsel may have, for strategic reasons, not wanted to probe the testimony about Tucker's knowledge of

Summing up the factors in controversy, we find the suppressed impeachment evidence about Morgan was immaterial because the evidentiary strength was weak, the information about her pending state charge and her potential federal charge was merely cumulative of other impeachment evidence on the record, and Morgan's testimony about Jasmine's age was sufficiently corroborated by other witnesses. See id. at 444. Accordingly, though the undisclosed information was not collateral we nonetheless conclude that its suppression does not undermine the confidence in the jury's guilty verdicts because there was not a reasonable probability of a different outcome had the government produced the information about Morgan's pending state charge before or during trial. See id. at 450. The trial judge did not, therefore, abuse his discretion when he denied Tucker's motion for a new trial. See Laureano-Salgado, 933 F.3d at 28-29.

**Last Words**

All that is left to say is Tucker's convictions are affirmed.

---

Jasmine's age and the circumstances surrounding his knowledge. But the weight to be given to properly admitted evidence was up to the jury. See United States v. Cruz-Ramos, 987 F.3d 27, 38 (1st Cir. 2021) ("[D]etermining where the truth lies is the sort of work that falls squarely within the jury's province." (quoting United States v. Nascimento, 491 F.3d 25, 46 (1st Cir. 2007))).